NEWSPAPER GUILD OF GREATER PHILADELPHIA, LOCAL 10, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Peerless Publications, Inc., Intervenor.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

PEERLESS PUBLICATION, INC. (Pottstown Mercury), Respondent,

Newspaper Guild of Greater Philadelphia, Local 10, Intervenor.

Nos. 78–1055, 78–1204.

United States Court of Appeals, District of Columbia Circuit.

Argued June 15, 1979.

Decided Aug. 13, 1980.

David S. Barr, Washington, D. C., with whom Bernard N. Katz, Philadelphia, Pa., and George Kaufmann, Washington, D. C., were on brief for petitioner in No. 78–1055 and intervenor in No. 78–1204.

John D. Burgoyne, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., with whom John S. Irving, Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel and David F. Zorensky, Atty., N. L. R. B., Washington, D. C., were on brief, for respondent in No. 78–1055 and petitioner in No. 78–1204.

Robert H. Jones, III, Albany, N. Y., for respondent in No. 78–1204 and intervenor in No. 78–1055.

Before McGOWAN and MacKINNON, Circuit Judges, and HAROLD H. GREENE,* U.S. District Judge for the District of Columbia.

Opinion for the court filed by District Court Judge HAROLD H. GREENE.

Opinion concurring filed by Circuit Judge MacKINNON.

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1.  No. 78–1204 is an application by the National Labor Relations Board for enforcement of its decision and order of August 9, 1977, in which it determined that Peerless Publication, Inc., through its wholly owned and operated newspaper, the Pottstown *Mercury*, violated § 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 141, *et seq.*, as amended, by refusing to bargain collectively with the authorized representative of its employees over the newspaper's promulgation of certain General Office Rules and a so–called Code of Ethics. The Newspaper Guild of Greater Philadelphia, Local 10, AFL–CIO, which functions as the employees' duly authorized bargaining representative, was the charging party before the Board and was granted leave by this Court to intervene.

No. 78–1055 is a petition for review by the Guild of the Board's decision and order in the same proceedings. In its petition, the Guild requests the Court to modify so much of the August 9, 1979, decision as dismissed several refusal–to–bargain allegations made by the *Guild against the Mercury concerning the Of*fice Rules and the Code of Ethics. The Mercury, respondent before the Board, was granted leave to intervene in that case. On March 20, 1978, the two cases were consolidated by the

HAROLD H. GREENE, District Court Judge:

These cases[1] involve the question whether the publisher of a newspaper may, consistently with the National Labor Relations Act, refuse to bargain collectively regarding a code of ethics and related work rules he has unilaterally adopted for his employees.

The Pottstown *Mercury*, a newspaper in suburban Philadelphia owned by Peerless Publications Inc. (both the newspaper and the publisher will generally be referred to herein as the Mercury),[2] operates under a collective bargaining agreement with the Newspaper Guild of Greater Philadelphia, Local 10, AFL–CIO, (hereinafter referred to as the Guild).[3] On July 1, 1968, the Mercury posted on its bulletin boards a list of twenty–five "General Office Rules," prepared by its publisher. At no time prior to the posting had he or any of his representatives given notice of the impending action to the Guild or its members, nor had there been any prior collective bargaining over

court for consideration on the merits. Jurisdiction rests on § 10(e) and (f) of the Act, 29 U.S.C. § 151 *et seq.*

2.  The *Mercury* has a circulation of between 28,000 and 31,000 in Montgomery, Chester, and Berks counties, Pennsylvania. It was acquired by Peerless Publications Inc. in December 1966, and it is affiliated with both the Associated Press and United Press International. By its own account, it seeks to present an up–to–date, accurate, and objective report of the news to its readers, and it does not regard itself as an advocacy–type publication.

3.  Contractual relations and collective bargaining between the Mercury and the Guild date back to September 1966, when the Guild was certified as the exclusive bargaining representative of the employees in the editorial and advertising departments. This first agreement between the Guild and the Mercury lasted two years, and it was followed by agreements reached in 1968 (following a brief, three–day strike), in 1970, and in 1973. The 1973 agreement was in effect during the period in question in these cases. At that time, the Guild represented approximately 58 members, including 15 in the news and editorial department, 10 in display advertising, 10 in classified advertising, 8 in circulation, and 4 in maintenance.

the formulation, effectuation, or impact of the Rules with the Guild.

The preamble to the Office Rules states that their "violation . . . may be deemed cause for discharge except in case of those rules where discharge is automatic." On May 10, 1972, the Mercury updated and amended the Rules and again posted them in the offices and distributed them to the employees. On April 3, 1974, all employees were given notice, through attachments to their paychecks, that the " . . . published and posted rules are, and always have been, in force . . . and will be enforced."

The Office Rules concern a variety of employee conduct, including abuse of liquor, disorderly conduct, use of company equipment for private purposes, garnishment of wages for personal debts, posting of circulars, treatment of company property, solicitation of funds on company premises, and various reporting and recordkeeping procedures.[4] Furnishing of false or misleading information, intoxication or drinking liquor on the Mercury's premises or engaging in work–stoppages or slow–downs are deemed to be dischargeable offenses. In addition, Rule 11 provides that

> All copy and proof, both news and advertising matter, must be treated as confidential. No information obtained by any employee by reason of his employment shall be made use of for himself or given out, or in any way made known prior to publication . . . . Employees must so conduct themselves outside of office hours as not to reflect adversely on the newspaper or cause loss of business or patronage. . . .[5]

The Guild did not protest at the time the Office Rules were first posted, but it did object during the August 1968 bargaining session, and again at a session in October 1968, both times without success. After the Guild threatened a strike in October 1968, the Mercury nullified warning letters and the conditional discharges which had previously been issued.[6] In 1970 and 1973, the publisher sought to include in the contract a clause which would have authorized the Mercury to "make or change rules, policies, or practices, except for those specifically provided for in the agreement," but the Guild consistently took the position that it would ignore this "purely . . . unilateral declaration" of management prerogatives.[7]

Notwithstanding this inconclusive bargaining history, the Mercury has enforced the Office Rules from the very beginning, and between 1968 and 1974 it issued approximately fifteen reprimands for alleged employee violations.[8] Disciplinary proceedings, including suspensions, discharges, and forced resignations, were begun against

---

4. The reporting procedures deal with such matters as notification of personnel changes of address and telephone numbers, reporting of personal injuries, accidents, and submission of physicians' statements for sick leave.

5. The Office Rules further provide that a department head may add to those rules " . . . more specific rules which apply to [an employee's] department."

6. Also included in the 1968 bargaining session was a proposal by the Mercury that the bargaining agreement include a broad "management rights" clause. This proposal was rejected by the Guild and was not included in the agreement entered into that year.

7. During the 1973 negotiations, the Mercury had unsuccessfully sought to expand the contractual definition of discharge for just cause so as to include "insubordination or neglect of duty." This provision would have added to the contract the very term for discharge the Mercury had applied in the previous warnings.

8. The earliest reprimand dated August 1, 1968, warned a union steward that his unauthorized absence from work to attend a union meeting constituted a "neglect of duty." At about that same time, several other employees were warned through letters from the publisher that the use of company cars for personal business which resulted in accidents, and the failure to note on personal time cards time spent on personal business, also constituted neglect of duty. Similar reprimands were issued from time to time until 1974, and concerned, among other things, improper placement of advertising, neglect of sales accounts, and lags in circulation. All these offenses were categorized in broad terms as neglect of duty, and they were rarely, if ever, referred to as breaches of specific Office Rules.

several employees, and the Guild has filed grievances against the Mercury pursuant to the collective bargaining agreement concerning these matters.[9] While some of these grievances were either withdrawn or settled, at least one—involving a discharge—was still pending before an arbitrator at the time of the National Labor Relations Board proceedings in this case.

On April 15, 1974, the Mercury posted in its offices and published in its pages a "Code of Ethics," a copy of which was also distributed to each employee along with his paycheck for that date.[10] The Code is loosely based on an ethics code adopted by the Sigma Delta Chi national society of professional journalists.[11]

The stated purposes of the Code are to spell out the Mercury's standards of integrity, objectivity, and fairness, and to protect and enhance its quality and credibility. According to the publisher, it was promulgated because " . . . in today's atmosphere of deteriorating integrity in various sections of the country, including Watergate and other things, and other newspapers, we felt that it was time that we set up some goals for ourselves." He noted the likelihood of a Guild objection, but stated his determination to proceed because of his belief that it is "management's prerogative to set its own ethical standards . . . [which are] part of the quality of the newspaper. . . ." He further declared that the Code applied to all employees, that it was a mandatory standard of conduct, and that the employees were bound to adhere to it under penalty of discipline.

The Code contains a preliminary statement of general principles and four substantive sections designated Ethics, Accuracy and Objectivity, Fair Play, and Pledge. Primarily at issue here is the Ethics section,[12] which is said to be based on the principle that "newspaper people must be free of obligation to any interest other than the public's right to know the truth." That section prohibits,[13] first, acceptance of anything of value which could "compromise the integrity of newspaper people and their employers," including gifts, favors, free travel, special treatment or privileges; and second, conflicts of interest, real or apparent, including secondary employment, political involvement, holding of public office, and service in community organizations.

Prior to the posting of the Code in April 1974, there had been no formal policy con-

**9.** The agreement stated that an employee may not be discharged or dismissed except for "just and sufficient cause," such cause to be found after specifically enunciated procedures had been followed by the Mercury.

**10.** The Mercury has conceded that its actions were unilateral in nature, and were promulgated without prior consultation with the Guild.

**11.** During the 1973 bargaining talks, the parties had discussed an "employee integrity" proposal, which the Guild had offered as part of its bargaining package. The proposal stated, among other things, that an "employee should not be required to perform, over his protest, any practice which in his judgment compromises his integrity." Initially the Mercury opposed this plan, but the final agreement included a clause which provided that, " . . . [i]f a question arises as to the accuracy of the printed material, the employee concerned will be consulted prior to any retraction of the material involved." The clause also stated that the Mercury was obligated to provide legal protection to an employee who, on advice of the newspaper's counsel, withheld from investiga-

tory bodies the source of information he may have gathered in the course of his employment.

**12.** The Accuracy and Objectivity section deals with the publisher's desire to stress truth, objectivity, accuracy, thoroughness, and lack of bias, and to eschew special advocacy unless labeled as such. The Fair Play section establishes standards of conduct designed to protect and respect the dignity, privacy, rights, and well-being of individuals encountered in the course of gathering and presenting the news. The Pledge section states that "any Mercury employee who does not wholly and fully subscribe to these tenets should make himself known now and state his reason."

**13.** The section also prohibits the publication of news communications from private sources without substantiation of their claim to news value; and it requires employees to "seek news that serves the public interest despite the obstacles," to "acknowledge the newsman's ethic of protecting confidential sources of information"; and to "conduct their lives in a manner which protects them from conflict of interest, real or apparent."

cerning gifts of value,[14] popularly known as "freebies," and employees had been allowed[15] a wide range of gifts, including many which provided access to various types of events and functions.[16] Freebies were provided both by advertisers and non-advertisers, and their use by the staff was also varied. Some of the gifts were used in connection with news coverage;[17] others were not.[18] Events which are covered by the Mercury, e. g., local sports, social and political events, were partially opened to admission by tickets mailed in to the editor,[19] by press passes, or simply by the showing of press cards at the door.

Beginning in May 1974, the publisher began to enforce the Code through verbal warnings, warning letters, and cease and desist orders[20] concerning outside activities which allegedly constituted conflicts of interest with employment.

On June 4, 1974, the Guild advised the Mercury that the Code of Ethics involved unilateral changes in terms and conditions of employment and was an unfair labor practice, and it requested that management engage in collective bargaining concerning the matter.[21] The Mercury refused, stating that it regarded its Code and the Office Rules as a management prerogative. The Guild thereupon filed charges with the Labor Board.

## II

The Guild's charges were heard by an Administrative Law Judge who ruled on

14. The Code does not specifically define what constitutes "value." The publisher barred one of the Mercury's advertisers from providing several bottles of liquor to employees on the advertising staff during the Christmas holiday. He ordered that the liquor be returned since one of the bottles had been destined for the "makeup" man who was in a position to place advertising.

15. The record is not clear as to whether prior to 1974 there had been any Mercury policy regarding outside employment or other potential conflicts of interest.

16. Among other things, employees were permitted free admissions to banquets, baseball games, charity balls, circuses, flea markets, golf tournaments, lectures, race tracks, sports arenas, and the Miss America contest. In almost all these cases, the freebies came to the newspaper unsolicited, through the mail, and were distributed to various employees by the editor. While some freebies (sports, circuses, race tracks) were recurring in nature, others were not (special events), and of the recurring freebies, some were from advertisers (race tracks and circuses), and others were from local organizations (Philadelphia Phillies tickets) which did not place advertisement in the newspaper but merely supplied courtesy passes.

17. E. g., tickets for the coverage of local sports events and charity balls. One reporter received a complimentary membership in one fraternal organization and paid dues in another, and both supplied him with news leads.

18. The Mercury received tickets for major league sports, circuses, and the like, which it does not cover.

19. Reporters and photographers were able to gain access to certain news–related events by receiving advances or reimbursements from the Mercury, but not invariably so. Section 6.1 of the collective bargaining agreement specifically provided that the Mercury would pay all necessary expenses incurred "in the service of the company," which were authorized, including transportation. In most situations, the Mercury's policy was to pay only the expenses of employees who were covering specific stories and had received advance authorization for the expense. Only in a spontaneous situation (fire, disaster, etc.) would the employee receive his expenses retroactively where he or she had not notified the management in advance. Most of the authorized payments were for travel and luncheon expenses incurred by salesmen.

20. On May 16, 1974, the publisher wrote warning letters to a reporter and a copyreader concerning their outside activities involving conflict of interests, stemming from participation and ownership in a local advertising and public relations agency. The publisher had known about this outside activity for some time prior to the warning letters, and had not objected until he learned that the agency had provided a local developer with advertising rate data from other newspapers in the area served by the Mercury, but had not included the Mercury's own rates. Upon discovering this action on the part of the employees, the publisher instructed the managing editor to warn them to cease and desist from the aforementioned action. After the oral warnings were issued, the warning letters were delivered to confirm the disciplinary action taken.

21. This was subsequently expanded to include the Office Rules.

September 23, 1975, that the Code of Ethics and the General Office Rules, *in toto,* were mandatory bargaining subjects, and that the Mercury had failed to comply with its obligation in that regard. He also held that the Guild had not waived its right to bargain over these subjects, and he ordered the company to rescind the Office Rules and the Code and to bargain with the Guild over their applicability to the agreement then in effect.

The Board affirmed part and rejected part of the ALJ's conclusions. It held that the Mercury had no duty to bargain with the Guild about the substantive provisions of the Ethics Code,[22] but that it did have such a duty with respect to its penalty provisions. The Board affirmed the ALJ's holding that the Office Rules are mandatory bargaining subjects, both substantively and with respect to penalties.[23]

Explaining its decision, the Board stated that the substantive provisions of the Code constitute a legitimate attempt by the publisher to protect and preserve the credibility and quality of his publication, and that they are for that reason beyond the scope of mandatory bargaining under the Act. In arriving at this conclusion, the Board relied primarily upon its recent holding in *The Capital Times Company,* 223 NLRB 651 (1976), which it regarded as standing for the proposition that newspaper codes of ethics are not, in and of themselves, mandatory bargaining subjects.

On the other hand, the Board concluded that the Office Rules (except for Rule 11) directly affect the conditions of employment and are not exempt from mandatory bargaining on any basis similar to that which sustained the exemption of the Code. With respect to its ruling that the penalty

provisions are mandatory bargaining subjects across–the–board, it reasoned, again relying on *Capital Times,* that to require an employee to adhere to the rules under penalty of discipline is to affect his employment security, and that the company must therefore bargain concerning this subject.[24]

The Board ordered the Mercury to cease and desist from the illegal conduct and to take affirmative action to effectuate the policies of the Act. It specifically required the company to bargain with the Guild on all aspects of the Office Rules (except for Rule 11) as well as concerning the penalty provisions of both the Code and the Office Rules. Chairman Fanning dissented from that much of the order as held that the substantive provisions of the Code and of Rule 11 of the Office Rules are not mandatory bargaining subjects (see also Part VII *infra* ).

### III

Section 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5), provides that it shall be an unfair labor practice for an employer to refuse to bargain collectively with the representative of his employees, and section 8(d), 29 U.S.C. § 158(d), defines collective bargaining as meeting and conferring in good faith with respect to wages, hours, and "other terms and conditions of employment." The basic issue before the court is whether, notwithstanding the apparently broad sweep of section 8(d), there is a valid basis for exempting the Code of Ethics and the Office Rules from the Act's bargaining requirements.

The parties have taken widely disparate positions on these issues. The Mercury contends that under the First Amendment to

**22.** The Board gave the same treatment to those portions of Rule 11 of the Office Rules which are related to the Code of Ethics.

**23.** In addition, the Board ruled that the May 16, 1974, warning letters to two employees regarding outside employment were violations under the Act and, contrary to the ALJ's findings, were not time–barred.

**24.** The Board also ruled that the warning letters issued in May 1974, which "closely followed" the Mercury's illegal promulgation of the unilateral Code penalty provisions, represented "attempts to implement the penalty provisions of that code." Since the Mercury had attempted to commit an illegal labor practice within the time period specified in section 10(b), this was held in and of itself to constitute a violation of the Act, and the letters were ordered rescinded.

the Constitution it has an absolute right to impose the conditions and penalties embodied in the two sets of rules, and that it therefore cannot be compelled to bargain concerning such matters, irrespective of the language of the statute. It also argues that, in any event, the dispute here may be resolved by arbitration and is for that reason outside the scope of collective bargaining. The Guild contends that every matter, touching in any way upon conditions of employment, is mandatorily, bargainable under the Act, including all of the rules at issue here. The Board concluded and argues here that the Office Rules (except for Rule 11) are subjects for mandatory bargaining in all their aspects; that the substantive provisions of the Code constitute a subject properly reserved for management and are not bargainable; and that enforcement of any of these provisions through punitive action is subject to mandatory bargaining.

For different reasons, and in different degrees, we disagree with the positions of all three parties.

IV

■ The Mercury's reliance on the First Amendment is plainly foreclosed by long-standing precedent. It is firmly established that a newspaper is not immune from the coverage of the National Labor Relations Act merely because it is an agency of the press. *See, e. g., Associated Press v. NLRB*, 301 U.S. 103, 132–33, 57 S.Ct. 650, 655, 81 L.Ed. 953 (1937). What the Supreme Court stated in *Branzburg v. Hayes*, 408 U.S. 665, 682–83, 92 S.Ct. 2646, 2657, 33 L.Ed.2d 626 (1972) in another context is fully applicable here: "It is clear that the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability, [and] otherwise valid laws serving substantial public interests may be enforced against the press as against others, despite the possible burden

that may be imposed." *See also, Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 192–93, 66 S.Ct. 494, 497, 90 L.Ed.2d 614 (1946) (Fair Labor Standards Act); *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) (antitrust laws); *Grosjean v. American Press Co.*, 297 U.S. 233, 250–51, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936) (general taxation).

■ To be sure, otherwise valid laws may become invalidated in their application when they invade constitutional guarantees, including the First Amendment's guarantee of a free press. *See, Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). So it would be with an interference by government with editorial content or other matters lying at the heart of a newspaper's independence. *Cf. Wichita Eagle & Beacon Publishing Co. v. NLRB*, 480 F.2d 52 (10th Cir. 1973), *cert. denied*, 416 U.S. 982, 94 S.Ct. 2383, 40 L.Ed.2d 758 (1974); *cf., Grosjean v. American Press Co., supra.* But our ruling in this case (see Part V *infra*) preserves to the Mercury exclusive control over those aspects of its operation, without the burden of mandatory bargaining,[25] which are fundamental to the enterprise and it thus avoids any possible constitutional problem. Thus, the First Amendment claim may be dismissed as without substance.

The Mercury suggests that the dispute herein, because it may be resolved by arbitration, is outside the scope of mandatory collective bargaining. The argument is that, even if the various rules it has adopted constitute mandatory bargaining subjects, its legal obligations have been satisfied because it stands ready to resolve disputes as to their interpretation and application through the existing grievance–arbitration machinery.

■ While arbitration is deemed a preferred means for settling labor disputes,

25. As noted elsewhere herein, *infra*, note 35, mandatory bargaining must not be equated

with mandatory agreement.

*Steelworkers v. Warrior & Gulf Co.*, 363 U.S. 574, 581–82, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960), it is likewise settled that the Labor Board need not refrain from exercising its authority to enforce the Act merely because arbitration procedures are available. *See, e. g., NLRB v. C&C Plywood Corp.*, 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967); *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 436–37, 87 S.Ct. 565, 568, 17 L.Ed.2d 495 (1967); *NLRB v. Huttig Sash & Door Co.*, 377 F.2d 964 (8th Cir. 1967). The Board's policy has been to defer to arbitration where disputes turn on collective bargaining agreements,[26] but not where they rest upon interpretations of the Act itself. *See Local Union No. 2188 v. NLRB*, 161 U.S.App.D.C. 168, 170–2, 494 F.2d 1087, 1088–91 (1974), *cert. denied*, 419 U.S. 835, 95 S.Ct. 61, 42 L.Ed.2d 61 (1974); *Office and Professional Emp. Int. U. Local 425 v. NLRB*, 136 U.S.App.D.C. 12, 17–18, 419 F.2d 314, 319–20 (1969).[27]

■ This is a matter for the Board to decide, and since its decision was based on considerations involving a rational policy choice, the court would not be justified in interfering with its expert judgment. *Meat Cutters v. Jewel Tea Co., Inc.*, 381 U.S. 676, 685, 85 S.Ct. 1596, 1599, 14 L.Ed.2d 640 (1965); *Richfield Oil Corp. v. NLRB*, 97 U.S.App.D.C. 383, 231 F.2d 717, 724 (1956), *cert. denied*, 351 U.S. 909, 76 S.Ct. 695, 100 L.Ed. 1444 (1956).

### V

■ The Guild's position presents more difficult problems. Nevertheless, we think it to be clear that a subject may affect conditions of employment and still be outside the scope of section 8(d).[28]

The point of departure for a discussion of this issue must be the concurring opinion of Justice Stewart (with whom Justices Douglas and Harlan agreed) in *Fibreboard Corp. v. NLRB*, 379 U.S. 203, 217, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964). That case involved the question whether an employer was required to bargain with respect to its decision to refer to an independent contractor certain maintenance work previously performed by union employees. The Court agreed with the Labor Board that such a decision was included within the concept of "other terms and conditions of employment" and therefore constituted a mandatory subject of collective bargaining. The majority's decision was narrow, apparently by deliberate choice.[29]

The concurring justices, although agreeing with the result, determined to canvas some of the broader issues raised by the case. In their view, and those of seven circuits which had passed upon the issue up to that time,[30] the language of section 8(d), while sweeping and apparently all–inclusive, must be construed to exclude various kinds of management decisions from the scope of the duty to bargain if the principle of control by the owner of property over basic decisions concerning his enterprise is to be preserved.

Mr. Justice Stewart demonstrated this exclusion principle by referring to employer

---

**26.** *Collyer v. Insulated Wire*, 192 N.L.R.B. 837, 839–42 (1971); *Local Union No. 2188 v. NLRB*, *supra*, 161 U.S.App.D.C. at 171–72, 494 F.2d at 1091–1092.

**27.** The contract provides that there "shall be no dismissals except for just and sufficient cause." This provision is inadequate to support the disciplinary actions pursuant to the Code or the Office Rules. *See Scam Instrument Corp.*, 163 NLRB 284, 289 (1967), *enforced*, 394 F.2d 884 (7th Cir. 1968), *cert. denied*, 393 U.S. 980, 89 S.Ct. 449, 21 L.Ed.2d 441 (1968); *Timken Roller Bearing Company* 70 NLRB 500, 501–2, (1946), *enforcement denied on other grounds*, 161 F.2d 949 (6th Cir. 1947).

**28.** This is consistent with the long–standing rule that section 8(d) does not require bargain-

ing over subjects only tangentially related to labor–management relations. *See, e. g., NLRB v. Massachusetts Nurses Ass'n*, 557 F.2d 894, 897–98 (1st Cir. 1977); *NLRB v. Columbus Printing Pressman*, 543 F.2d 1161, 1166 (5th Cir. 1976); *NLRB v. Davison*, 318 F.2d 550, 557 (4th Cir. 1963).

**29.** However, it, too, noted that to require the employer to bargain about contracting out "would not significantly abridge his freedom to manage the business." 379 U.S. at 213, 85 S.Ct. at 404.

**30.** *Fibreboard Corp. v. NLRB*, *supra*, 379 U.S. at 222, n.7, 85 S.Ct. at 409, n.7.

decisions to go out of business entirely or, less drastically, to invest in labor–saving machinery (to which might be added reductions in an advertising budget, failures to bid on certain contracts, changes in the line of products being offered, and the like). All such decisions may have the effect, to a greater or lesser degree, of destroying or imperilling the job security of all or some employees. Nevertheless, although ordinarily union demands for contract provisions which would limit an employer's ability to discharge are mandatorily bargainable—on the theory that job security is fundamental to employment [31]—bargaining has never been required concerning decisions of the type referred to by Justice Stewart. That is so because, in his phrasing, they "lie at the core at entrepreneurial control . . are fundamental to the basic direction of a corporate enterprise . . . or concern its basic scope ̇. . ." 379 U.S. at 223, 225, 85 S.Ct. at 410.

■ Other decisions have elaborated and embroidered upon those concepts since 1964, without adding to the substance of the *Fibreboard* concurrence. See *Allied Chemical Workers v. Pittsburgh Glass Co.*, 404 U.S. 157, 179 n.19, 92 S.Ct. 383, 397, n.19, 30 L.Ed.2d 341 (1971); *International Ladies Garment Workers U. v. NLRB*, 150 U.S. App.D.C. 71, 79–80, 463 F.2d 907, 915–16 (1972); *NLRB v. Royal Plating & Polishing*

*Co.*, 350 F.2d 191, 195–96 (3rd Cir. 1965).[32] In none of the decided cases was any expressed agreement with the *Fibreboard* concurrence critical to the outcome, and there is therefore no binding precedent. However, in our view that concurrence correctly interprets the law, and we shall apply it here.

The Guild argues that, whatever may be the precedential value of the *Fibreboard* concurrence, its rationale should be limited to the commitment of capital investment and similar subjects, and that the protection of a news publication from conflicts of interest among its staff is in a different category.

■ We agree with the conclusion reached by the Board in this case and in *Capital Times, supra*, that protection of the editorial integrity of a newspaper lies at the core of publishing control. In a very real sense, that characteristic is to a newspaper or magazine what machinery is to a manufacturer. At least with respect to most news publications, credibility is central to their ultimate product and to the conduct of the enterprise.[33] Moreover, as noted *supra*, editorial control and the ability to shield that control from outside influences are within the First Amendment's zone of protection and therefore entitled to special consideration.[34]

---

31. *Id.* at 222, 85 S.Ct. at 409.

32. *See also*, Cox & Dunlop, Regulation of Collective Bargaining By the National Labor Relations Board, 63 Har.L.Rev. 389, 401 (1950) ("the type of product which a company chooses to make, its price policies, the location of its plants, its choice of production processes and the assignment of workers are matters of practical importance to its employees [yet] it is generally agreed that management should have exclusive responsibility for such matters without the intervention of the union"); Cristensen and Svanoe, Motive and Intent in the Commission of Unfair Labor Practices: The Supreme Court and the Fictive Formality, 77 Yale L.J. 1269, 1297, 1306–07 (1968); *cf.*, Larry, Labor–Management Problems–A Management Viewpoint, 50 Va.L.Rev. 266, 289–292 (1964).

33. Although many newspapers are thriving notwithstanding political bias, sensationalism, and inaccurate reporting, the suspicion of advertiser domination or other financial conflicts

of interest on the part of a publication or its reporters can be as injurious to a newspaper's reputation and economic well–being as to that of a public official. See, for example, a Wall Street Journal memorandum to its new employees reprinted in the Spring 1968 issue of the Columbia Journalism Review, p. 41 ("it is important for all reporters and deskmen to keep in mind the tremendous embarrassment and damage to the paper's reputation that could come about through a lapse in judgment by one man, no matter how well intentioned he may be"); see also, Tate, Conflict of Interest: A Newspaper's Report on Itself, July/August 1978 Columbia Journalism Review, pp. 44–48.

34. Cf. *Associated Press v. NLRB, supra*, 301 U.S. at 133, 57 S.Ct. at 656; *Branzburg v. Hayes, supra*, 408 U.S. at 680 n. 17, 700, 92 S.Ct. at 2656 n. 17, 2666. We need not consider and we intimate no opinion on the issues here in a context where credibility and integrity are claimed to occupy a central place with

In order to preserve these qualities, a news publication must be free to establish without interference,[35] reasonable rules[36] designed to prevent its employees from engaging in activities which may directly compromise their standing as responsible journalists and that of the publication for which they work as a medium of integrity. See note 50 *infra*.

On this basis, we reject the Guild's position that collective bargaining is mandatory on all aspects of the Newspaper's Ethics Code and its Office Rules.[37]

## VI

As its decisions in this case and in *Capital Times* demonstrate, the Labor Board is cognizant of the problems presented by the tension between the employees' right to bargain collectively and the right of the owner of a newspaper to safeguard the credibility of his publication from injury through improper conflicts of interest. However, it sought to solve these problems through means which are faulty in two basic respects. First, the Board improperly lumped together the entire Code of Ethics (including Rule 11 of the Office Rules) in a single category, holding all of it, without

individualized analysis, exempt from mandatory bargaining.[38] Second, it erroneously determined that, notwithstanding its broadly negative conclusion on the substance of the Code, disciplinary actions for violations of the rules established thereby are nevertheless subject to mandatory bargaining. We will consider each of these aspects of the Board's ruling in turn.

In regard to the substantive rules, the Board made no attempt to distinguish between those provisions of the Code which, while central to the Mercury's interest in the preservation of its legitimate managerial prerogatives, affect the employees only minimally, and those which, although not essential to the publication's freedom to conduct its business, do have a significant impact on the employees. Yet such a distinction must be made, for several reasons.

In the first place, labor law presumes that a matter which affects the terms and conditions of employment will be a subject of mandatory bargaining.[39] The Congress intended the concept "terms and conditions of employment" to be generally inclusive for, as Mr. Justice Black, speaking for the Court in *Railroad Telegraphers v. Chicago & N.W.R. Co.*, 362 U.S. 330, 335, 80

respect to a commercial enterprise not possessing the special characteristics of a news publication.

**35.** To be sure, a requirement that the employer must bargain does not necessarily mean that he must reach agreement. *NLRB v. American National Ins. Co., supra*, 343 U.S. at 402. But once a subject is deemed bargainable, it will sustain the legality of the use of economic weapons in the event agreement is not reached. *NLRB v. Insurance Agents*, 361 U.S. 477, at 489, 80 S.Ct. 419, at 427, 4 L.Ed.2d 454 (1960); see also, *Lodge 76, International Association of Machinists & Aerospace Workers v. Wisconsin Employment Relations Commission*, 427 U.S. 132, 148–149, 96 S.Ct. 2548, 2557, 49 L.Ed.2d 396 (1976).

**36.** The degree of control which may be exercised by a publication in this regard is not open–ended, but must be narrowly tailored to the protection of the core purposes of the enterprise. See Part VI *infra*.

**37.** Because of this conclusion, it is unnecessary for us to address the additional factors cited by the Board–that ethical standards have not tra-

ditionally been a subject of bargaining in the newspaper industry (compare Inland Steel Co., *supra*, 77 NLRB at 9–10; *NLRB v. Insurance Agents, supra*, 361 U.S. 488–89, 80 S.Ct. 426–27) and that the Newspaper's motivation was not primarily economic.

**38.** The wholesale exemption of the Office Rules other than Rule 11 is more readily justifiable because it appears that little, if anything, in those Rules is properly excludable from bargaining as being inherently in the exclusive management category. However, the final decision with regard to that issue must be made by the Board upon remand in light of the standards laid down herein.

**39.** See, *Chemical Workers v. Pittsburgh Glass Co., supra*, 404 U.S. at 178–79, 92 S.Ct. at 397; *East Bay Union of Machinists v. NLRB*, 116 U.S.App.D.C. 198, 201, 322 F.2d 411, 414 (1963), aff'd. sub nom., *Fibreboard Corp. v. NLRB, supra; Howard Johnson Co. v. Hotel Employees*, 417 U.S. 249, 254–56, 94 S.Ct. 2236, 2239, 4 L.Ed.2d 46 (1974).

S.Ct. 761, 764, 4 L.Ed.2d 774 (1960), said with respect to the analogous section 13(c) of the Norris–LaGuardia Act,[40] "Congress made the definition broad because it wanted it to be broad." [41] There is no evidence that the Board took these principles into account when it determined that all of the substantive provisions of the Mercury's Code of Ethics, without distinction, are exempt from mandatory bargaining.

▇ Moreover, when there is a conflict between an employer's freedom to manage his business in areas involving the basic direction of the enterprise and the right of employees to bargain on subjects which affect the terms and conditions of their employment, a balance must be struck, if pos-sible,[42] which will take account of the relative importance of the proposed actions to the two parties. *Fibreboard Corp. v. NLRB, supra,* 379 U.S. at 223, 85 S.Ct. at 409;[43] *Allied Chemical Workers v. Pittsburgh Plate Glass Co., supra,* 404 U.S. at 179, 92 S.Ct. at 397;[44] *International Ladies Garment Workers Union v. NLRB,* 150 U.S. App.D.C. at 79–80, 463 F.2d at 915–16.[45] Again, there is no indication that the Board engaged in this kind of analysis.

Without meaning to be exhaustive or definitive, since these are matters which must be decided initially by the Board,[46] we perceive significant differences between, for example, a gift [47] from a news source designed to influence news coverage, and a

**40.** Section 8(d) was enacted as part of the Taft–Hartley Act, but the pertinent language stems from the Norris–LaGuardia Act and the Wagner Act. Section 8(3) of the Wagner Act, 49 Stat. 449, prohibited employer discrimination in regard to hire or tenure of employment or "any term of condition of employment" to encourage or discourage union membership. Likewise, section 2(9) of that Act, which was retained in full in the Taft–Hartley Act, defines "labor dispute" as the "association of persons in . . . seeking to arrange terms or conditions of employment." That phrase was lifted *in haec verba* from section 13(c) of the Norris–LaGuardia Act, 47 Stat. 70 *et seq.,* and it was intended to have the same meaning in the Wagner Act and the Taft–Hartley Act. *See, Fibreboard, supra,* 379 U.S. at 210, 85 S.Ct. at 402.

**41.** The original Hartley bill in the House of Representatives would have given a far narrower scope to labor management relations. H.R. 3020, 80th Cong., 1st Sess., 22–23, 1 Leg. Hist. 313–314. That bill used the term "working conditions" as the specific subject of mandatory bargaining, a term which, according to Senator Wagner, would have excluded many subjects which properly belong in the employer–employee relationship and "in regard to which the employer should not have the power of industrial absolutism." 1 Leg.Hist. 998. *See also, Inland Steel Company,* 77 NLRB 1, 7, enf'd., 170 F.2d 247 (7th Cir. 1948), *cert. denied,* 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 (1949).

**42.** Sometimes–as where the employer wishes to close his plant–it may be impossible to strike such a balance. There is no reason to believe that this dilemma will be presented in these cases.

**43.** The concurring Justices in *Fibreboard* pointed out that where the impact of a particular management decision upon job security is ex-tremely indirect and uncertain, this alone may be sufficient reason to conclude that it is not "with respect to . . . conditions of employment." 379 U.S. at 223, 85 S.Ct. at 409.

**44.** In that case, the Court noted that in deciding whether a matter is subject to mandatory bargaining under section 8(d) of the Act, although it must be considered whether the particular concern "vitally affects the 'terms and conditions' of their employment, other considerations, such as the effect on the employer's freedom to conduct his business, may be equally important." 404 U.S. 179, n. 19, 92 S.Ct. 397.

**45.** "Bargaining is mandatory only with regard to subjects which fall within [the language of section 8(d)], and in construing section 8(d) 'in each case the interests of the employees and the purpose of the National Labor Relations Act . . . must be carefully balanced against the right of an employer to run his business.' " 150 U.S.App.D.C. at 79–80, 463 F.2d at 915–16.

**46.** *Allied Chemical Workers v. Pittsburgh Plate Glass Co., supra,* 404 U.S. at 182, 92 S.Ct. at 399; *Richfield Oil Corp. v. NLRB,* 97 U.S.App. D.C. 383, 389–90, 231 F.2d 717, 723–24 (1956), *cert. denied,* 351 U.S. 909, 76 S.Ct. 695, 100 L.Ed. 1444 (1956); *NLRB v. Erie Resister Corp.,* 373 U.S. 221, 236, 83 S.Ct. 1139, 1149, 10 L.Ed.2d 308 (1963).

**47.** The *New York Times* apparently prohibits its financial reporters to accept from brokerage firms the opportunity to buy new issues or to speculate in the stock of companies they cover. See McKee, Reporters and Insiders: Financial News and Stock–Buying, Spring 1968 Columbia Journalism Review 36, 40. A survey con-

freebie[48] (e. g., a ticket to a major league baseball game) given relatively indiscriminately to journalists and other well–known persons.[49] Similarly, it would seem to be appropriate to distinguish between a reporter's secondary employment constituting a clear conflict of interest (e. g., public relations work for a major advertiser or an organization the reporter is covering) and such activities–all proscribed by the Mercury's Code of Ethics–as employees' compromising "political involvement, holding public office, and service in community organizations" and their failure so to "conduct their personal lives [as would protect them] from conflict of interest." There may also be a legitimate distinction, for ethics code–mandatory bargaining purposes, between categories of employees, e. g., reporters and editorial personnel vs. maintenance and circulation employees.[50]

In each instance, regulation of the former category would appear to be reasonably related to the core concerns of a newspaper's management without vitally affecting the interests of the employees; regulation of the latter interferes substantially with the civil and economic rights of the employees (and indeed their private lives)

without clearly defined, directly necessary compensating benefits in terms of the employer's legitimate concerns.

We do not mean to render final judgments on the application of these principles to the facts of this case. The responsibility for making such decisions is vested in the Board. That agency possesses the requisite special expertise for making specific determinations in this highly delicate field which encompasses both labor relations and the workings of the press, and its detailed factual findings are likely to illuminate the framework of mere general principles. *Allied Chemical Workers v. Pittsburgh Glass, supra*, 404 U.S. at 182, 92 S.Ct. at 399; *Richfield Oil Corp. v. NLRB*, 99 U.S.App. D.C. at 389–90, 231 F.2d at 723–24; *NLRB v. Erie Resister Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1149, 10 L.Ed.2d 308 (1963). But in our view the Board did not, in the decision under review here, make the necessary judgments with the particularity and sensitivity that is required in these circumstances.

## VII

The Board sought to discharge its obligation with respect to the Code of Ethics and

ducted by the Columbia Journalism Review (Spring 1970 issue, p. 42) shows that one hundred percent of the reporters and editors polled believed it to be appropriate to accept awards from journalism groups or educational institutions, but seventy–two percent regarded it as improper to accept cash prizes from groups on whose activities they regularly report (including such prestigious organizations as the American Medical Association).

**48.** The Board correctly concluded that freebies are not "wages" because newspapers do not hold themselves out as providing a service to their news sources by printing stories in return for payments from them. *Capital Times, supra*, 223 NLRB at 652. *Compare Statler Hilton Hotel*, 191 NLRB 283 (1971), enf'd., 82 LRRM 2538 (1972) (unpublished opinion); *Harrah's Club*, 158 NLRB 758 (1966), enf'd., 403 F.2d 865 (9th Cir., 1968) (tips or gratuities received by restaurant or theatrical employees).

**49.** This is particularly so if, as occurred at times at the Mercury, the tickets are actually distributed by the editor.

**50.** In line with these general principles, it may be that a newspaper might have the right, for

example, to order a reporter assigned to the city hall beat to refrain from "moonlighting" as a mayor's assistant for public relations; to require a nationally syndicated columnist to make a choice between his column and participation in a national political campaign as a prominent party official; or to forbid its reporters to work for the Central Intelligence Agency if such employment were deemed to diminish the publication's credibility abroad as a bona fide news organization. At the same time, it does not appear clear that the need to preserve editorial integrity would necessarily support a non-bargainable requirement of employee abstention, irrespective of position or assignment, from political participation and service in community organizations or that it would sustain a general directive concerning the conduct of the employees' personal lives, with its potential for misuse against those with whose political, social, religious, or union beliefs a publisher may disagree. Of course, it is the Board which will have to make these kinds of judgments on the basis of an appropriate record, and nothing herein should be deemed to foreclose its exercise of that authority.

Rule 11 of the Office Rules by holding the substantive rules themselves excluded *in toto* from the mandatory bargaining requirement while concluding that the penalty provisions attached to these rules are in every respect subject to such bargaining.

We agree with Chairman Fanning of the Board who said in his dissent in the *Capital Times* case:

> . . . Not the least of my difficulties lies in trying to understand how the penalty provision, in isolation, can be a mandatory bargaining subject. And, if it is, how the parties are to bargain about it . . . . Even were we bereft of guidance in this area, the conclusion that the penalty provision is a condition of employment, but the code enforcing it is not, would necessarily fall as contrary to reason and at war with the practical considerations of collective bargaining . . . . As a practical matter, requiring that the Respondent bargain over the penalty provision but not the rules is simply unworkable. The penalty provision is a constituent part of the rules. It has no separate existence and, standing alone, has no meaning whatsoever. "Multiple violations will result in discharge." Violations of what? The provision has meaning only insofar as it is infused of meaning by its relation to the rules as a whole, of which it is but a constituent part. Forcing one party or the other to accept a pig in a poke will not effect meaningful collective bargaining. 223 NLRB at 656–67.

In a footnote, Mr. Fanning further observed:

> Rules without penalties, express or implied, are only opinion. The expression of opinion, barren of any threat or promise of benefit, is not only protected by the Constitution of the United States, *NLRB v. Virginia Electric & Power Company*, 314 U.S. 469 [, 62 S.Ct. 344, 86 L.Ed. 348] (1941), but also has been accorded explicit

protection under the National Labor Relations Act in Sec. 8(c). If rules and their enforcement are severable, then we can never find a violation with respect to a rule. To do so would be contrary to both the Constitution and Sec. 8(c). Without meaning to impinge on theology, I suggest that where there is no effect there can be no cause. If there is no requirement that the rule be observed, it cannot affect, or be, a term or condition of employment. Conversely, rules with penalties, express or implied, are conditions of employment; cause and effect. That does not even require a leap of faith. 223 NLRB at 656, n. 7.

■ Like Mr. Fanning, we are unable to understand how, either on conceptual or on practical grounds, penalties can be separated for Labor Act purposes from the substantive provisions which they are designed to enforce. Both are either mandatorily bargainable or they are not.[51]

■ The majority of the Board in its decision, and the representatives of the Board in their brief here, failed to address these concerns. Instead, the Board simply noted in its decision in *Capital Times* (223 NLRB at 654) that it had previously held rules and regulations to constitute mandatory subjects for bargaining, "particularly where penalties are prescribed for their violation" (citing such cases as *Murphy Diesel Company*, 184 NLRB 757, 762 (1970), enf'd., 454 F.2d 303 (7th Cir. 1971)).[52] But that is an inadequate justification for a decision which makes penalties bargainable but not the underlying rules and regulations.

■ Upon remand, the Board will be expected to make substantive determinations with respect to the various provisions of the Code of Ethics and the Office Rules and come to a decision whether, in light of the principles laid down herein, any particular subject matter is or is not within the

---

**51.** The concurrence reads Chairman Fanning's language as making every rule that carries a penalty mandatorily bargainable. We think, however, that this is neither the purpose nor the effect of Mr. Fanning's dissent.

**52.** *See also Donna Lee Sportswear*, 174 NLRB 381 (1969), enf'd., 435 F.2d 559 (3rd Cir. 1971); *Tiidee Products, Inc.*, 176 NLRB 969 (1969), enf'd., 142 U.S.App.D.C. 270, 440 F.2d 298 (1970).

mandatory bargaining category. To the extent that it is, any penalty attaching to a substantive rule must be regarded as being likewise mandatorily bargainable; to the extent that it is not, the related penalty provisions will also have to be regarded as exempt from the bargaining requirement.

For the reasons stated, these cases are remanded to the National Labor Relations Board for proceedings not inconsistent with this opinion.

*So ordered.*

MacKINNON, Circuit Judge (concurring):

The foregoing opinion is an excellent analysis and I agree generally with the result it reaches; however, I desire to elaborate on several points and there are a few minor points of disagreement that I feel should be discussed. At the outset the Code of Ethics of April 15, 1974 (hereinafter Code) (J.A. 179) and the General Office Rules of May 10, 1972 (hereinafter "Rules") (J.A. 180–81) are set forth in their entirety as an Appendix.

### I

First, as to a point of disagreement, it is contradictory to state that Justice Stewart's famous concurrence in *Fibreboard Corp. v. NLRB*, 379 U.S. 203, 217, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964) "correctly interprets the law, and we shall apply it here" (Maj.

op. at 560) and then subsequently state, "We agree with Chairman Fanning of the Board who said in his dissent in the *Capital Times* case: . . . *rules with penalties, express or implied, are conditions of employment* . . . [and hence mandatorily bargainable.]" Maj. op. at 564 (Emphasis added).

By that statement the dissent in *Capital Times* would convert every rule that carried a penalty into a mandatory subject for collective bargaining between management and the union. The *Capital Times* dissent gave as its reason for this construction of the Act "that if employment is to continue only so long as an employee adheres to certain rules, then *adherence to those rules is a condition of employment* [and hence a mandatory subject of bargaining]". *The Capitol Times Company*, 223 NLRB at 657 (dissent). This simplistic construction of the Act, which was rejected by the Board in *Capital Times* and in this case, fails to recognize the broader Congressional intent which Justice Stewart in *Fibreboard Corp. v. Labor Board*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964)[1] discerned as recognizing that certain "prerogatives of private business management" constituted an area of employer–employee relationship that is exempt from mandatory collective bargaining. Such widely varied intellects as Justices Douglas and Harlan also joined in his concurring opinion, and it has since ac-

---

**1.** Justice Stewart's concurring opinion in *Fibreboard* remarks that switching to subcontracting out "work [which was] ultimately *supervised by the company's officials* and functioning as an integral part of the company . . . [u]nder a cost plus arrangement . . . [whereby] Fibreboard remained responsible for whatever management costs were actually incurred . . . [imposed] a duty to bargain collectively concerning the employment." 379 U.S. at 219, 85 S.Ct. at 407. What the employer was actually doing there was bringing about the "substitution of one group of workers for another to perform the same task in the same plant under the ultimate control of the same employer." 379 U.S. at 224, 85 S.Ct. at 410. (Emphasis added). Ordinarily, subcontracting work had been held not to be a mandatory subject for collective bargaining. *National Labor Relations Board v. Adams Dairy, Inc.*, 322 F.2d 553 (8th Cir. 1963); *NLRB v. Houston*

*Chronicle Pub. Co.*, 211 F.2d 848 (5th Cir. 1954). The decision in *Fibreboard* is thus nothing more than an opinion that where the new workers were "ultimately *supervised* by the [same] company officials" as the discharged employees, the workers doing the subcontracted work were in effect company employees and the circumstances of their employment were subject to collective bargaining. This was pointed out by Justice Stewart's opinion which indicates that the holding of the case with respect to subcontracting is an aberration of the normal rule. The majority in *Fibreboard* indicated the narrow compass of its holding. Chief Justice Warren stated: "We are thus not expanding the scope of mandatory bargaining. . . . Our decision need not and does not encompass other forms of 'contracting out' or 'subcontracting' which arises daily in our complex economy."

quired wide national recognition and support. It is also significant that Chief Justice Warren's Opinion for the Court in *Fibreboard* recognized management prerogatives when he pointed out that the decision would only affect them to a limited extent, i. e.: "Therefore, to require the employer to bargain about the matter would not significantly abridge his freedom to manage his business." 379 U.S. at 213, 85 S.Ct. at 404. Congress also recognized the wide freedom of employers to manage their businesses through supervisors by § 14(a) of the Act:

> . . . [No] employer subject to this [Act] shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining.

29 U.S.C. § 164(a). 1 Legislative History of the Labor Management Relations Act 434.

Justice Stewart's concurring opinion also states:

> . . . it surely does not follow that every decision which may affect job security is a subject of compulsory collective bargaining.

379 U.S. at 223, 85 S.Ct. at 409. This is a direct contradiction of the Fanning dissent and there is more of the same. So we cannot agree both with Justice Stewart's concurrence and the Fanning dissent. The

majority, however, in n. 51 indicates that it does not construe the Fanning dissent as making every rule that carries a penalty mandatorily bargainable.[2]

The Stewart opinion then cited several Courts of Appeals decisions that supported his interpretation of the Act as carving out a class of "managerial decisions, which lie at the core of entrepreneurial control", 379 U.S. at 223, 85 S.Ct. at 409, from the statutory obligation of mandatory collective bargaining. In conclusion his concurring opinion states:

> If, as I think clear, the purpose of § 8(d) is to describe a limited area subject to the duty of collective bargaining, those management decisions [3] which are *fundamental to the basic direction of a corporate enterprise* or which impinge only indirectly upon employment security should be excluded from that area.

379 U.S. at 223, 85 S.Ct. at 409. (Emphasis added).

The Stewart concurrence followed prior decisions of Courts of Appeals which had recognized an area of business decisions by management that were not mandatorily bargainable. The description of such decisions varied: *NLRB v. Adams Dairy, Inc.*, 322 F.2d 553, 556, 557 (8th Cir. 1963) (exercise of "purely managerial prerogative[s]"

---

**2.** The Fanning dissent argues as follows:

> If an employee does not conform to the rules, his employment will either be suspended or terminated; and the rules will be the cause. Rules which determine employee conduct, income, or job security are inescapably terms and conditions of employment [and hence mandatorily bargainable]. It is difficult to see how it can be argued otherwise when the rules have been adopted by the Respondent precisely because it believes that the areas covered by the rules affect the work of its employees sufficiently to make employment contingent upon their observation.

223 N.L.R.B. at 656. Thus this and the other quoted extracts from the Fanning dissent would not allow any lee-way in employment rules for the prerogative of private business management such as we have here and which are the core of Justice Stewart's classic concurrence. In fact the Fanning dissent points out that the employer's remedy is to bargain to impasse. *Id.* at 657. However, it is significant that the majority does not interpret the statute

or the Fanning dissent to contradict Justice Stewart's concurrence and hence there is no necessity for the Board to depart from Justice Stewart's concurrence in interpreting the statute in this case.

**3.** The term "management rights" or "management prerogatives", as used in union–management relationships, has been defined to mean "rights reserved to management, which may be expressly noted as such in a collective bargaining agreement, usually including the right to schedule promotion, to determine the process of manufacture, to maintain order and efficiency, to hire, etc." U.S. Dept. of Labor, *Glossary of Current Industrial Relations and Wage Terms* 52 (Bull. No. 1438, May 1965).
*Kheel, Labor Law* § 4304(3), n. 30 (1974). This is not an exhaustive definition.

A Minnesota Statute provides that a public employee cannot be required to meet or negotiate on *matters of managerial policies.* Minnesota Stat.Ann. § 179.66(1).

"motivated by economic necessity"); *NLRB v. New England Web, Inc.*, 309 F.2d 696, 702 (1st Cir. 1962) ("legitimate managerial prerogatives"); *NLRB v. Rapid Bindery, Inc.*, 293 F.2d 170, 172 (2d Cir. 1961) ("legitimate exercise of managerial discretion"); *Jays Foods, Inc. v. NLRB*, 292 F.2d 316, 320 (7th Cir. 1961) ("right of management to avert a threatened economic loss and operate its business according to established principles"); *NLRB v. Houston Chronicle Pub. Co.*, 211 F.2d 848, 855 (5th Cir. 1954) ("ordinary act[s] of business management").

Thus, Justice Stewart's concurrence with which we agree concluded that mandatory collective bargaining did not extend to "such larger entrepreneurial questions as what shall be produced, how capital shall be invested in fixed assets, or *what the basic scope of the enterprise shall be.*" 379 U.S. at 225, 85 S.Ct. at 410. (Emphasis added). The last category comes closest to covering the circumstances of this case. These exceptions to mandatory collective bargaining do not exhaust the class. To them must be added circumstances which might be considered as having a general relationship to "the basic scope of the enterprise" but which could be described more specifically and would include a number of the circumstances of employer–employee relationships that are present in this case.

## II

At this point it is appropriate to comment on a few specific provisions of the Code and Rules and to set forth my general views as to their being mandatorily bargainable. In my opinion an employing newspaper has a right unilaterally to determine the nature, character and quality of the newspaper it will publish and to prescribe such goals in a Code and Rules which provide for discipline up to discharge for employees whose conduct defeats or threatens the realization of the stated objectives. The newspaper can determine certain qualifications for the original employment of workers and their

subsequent performance that are so fundamental to the basic nature and public character of the newspaper that violations can be made dischargeable offenses and need not be the subject of collective bargaining. Such standards of employment and performance might require a degree of ability and individual character that the employee must maintain to avoid disciplinary actions, including discharge. The basic skill level to qualify for the job is not a bargainable subject. A newspaper must have untrammeled authority to set standards of workmanship that determine its intrinsic excellence and its quality and public character. I refer primarily to the work of reporters, editorial writers, officers and management personnel, though there may be other positions that could be subjected to similar requirements.

In addition, in my view, an employer has an absolute right and need not bargain about his right to discharge a person for what is generally considered good "cause". This right is expressly recognized by § 10(c) of the Act.[4] Included in this class of general misconduct is disorderly conduct on the newspaper's premises (Rule 9); violating state laws concerning gambling on company premises (Rule 6); being intoxicated or under the influence of drugs on company premises (Rule 5); furnishing false employment information (Rule 4). Other recognized grounds for dismissal or discipline would include engaging in work stoppages on company property (slow–downs or sit–downs) during working hours. *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940); *NLRB v. Fansteel Metallurgical Corp.*, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627 (1939); *NLRB v. Blades Mfg. Corp.*, 344 F.2d 998 (8th Cir. 1965); *Kheel, Labor Law* § 29.02 (1974). Likewise, the acceptance of gifts that "compromise[s] the integrity" of the employees and threatens the quality of the newspaper (Code, Ethics, 1), and "secondary employ-

4. 29 U.S.C. § 160(c) provides:
   ". . . No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or suspended or discharged for cause. . . ."

ment . . . [that] compromises the integrity of newspaper employees and their employers" (Code, Ethics, 2), may violate the basic loyalty that an employee owes to his employer. The establishment of such standards should not be mandatorily bargainable.

However, I do question whether it is proper in the Code to require newspaper people to "acknowledge the newsman's ethic of protecting confidential sources of information." Code, Ethics, 5. Following this "ethic" to its logical conclusion has not been supported by the courts, in the absence of statutory recognition. Pennsylvania law should be examined on this point. If the law has not shielded such conduct the "ethic" might require newspaper employees to commit a violation of law. Under such circumstances it would be my view that a newspaper has no right to require or enforce such a provision.

In my opinion a newspaper also has the absolute right to determine the qualifications of reporters and discharge or otherwise discipline them if their "objectivity in reporting" does not meet the newspaper's standards. Code, Accuracy and Objectivity, 2. However, if this requirement were strictly applied and reporters were discharged for not making a "clear distinction between news reports and expressions of opinion", it would seem that many reporters would be out of work. The same goes for the requirement that "news reports should be free of opinion or bias and represent all sides of an issue." *Id.,* 5.

The law in my opinion also authorizes a newspaper to protect its editorial integrity by disciplining or discharging employees whom it considers to constitute a threat to such objectives. To the extent that the Code and Rules contain such provisions, in my opinion, they would not be mandatory subjects for bargaining. Such discretion must rest with the newspaper.

Further, I believe that each substantive provision of the Code and Rules is to be considered separately, but in conjunction with the applicable penalty, if any. The substantive provisions cannot generally be considered apart from the penalty. The Court's opinion states as follows:

> Upon remand, the Board will be expected to make substantive determinations with respect to the various provisions of the Code of Ethics and the Office Rules and come to a decision whether, in light of the principles laid down herein, any particular subject matter is or is not within the mandatory bargaining category. To the extent that it is, any penalty attaching to a substantive rule must be regarded as being likewise mandatorily bargainable; *to the extent that it is not, the related penalty provisions will also have to be regarded as exempt from the bargaining requirement.*

Maj. op. at pp. 564–565. (Emphasis added.)

I would not look first at the substantive rule and then at the penalty only if the Rule is considered bargainable. I would view such substantive rule and its penalty together in the first instance. This may be only a slight difference from the Court's opinion but I feel the two generally go together.

In the procedure as outlined above by the Court's opinion, it should also be noted that the last clause quoted above (italicized) does not follow logically from its predecessor. In this connection, while I do not have a concrete case, I can foresee that in some cases possibly an excessive penalty, because of its excessiveness, might become a subject for mandatory bargaining. Finally, I do not agree that the facts of this case are so complex or the issue so close as to call for balancing of the "employer's freedom to manage his business" against the employees' "right . . . to bargain on subjects which affect the terms and conditions of their employment." Maj. op. at p. 22. Rather I believe the decision should result solely from giving the language of the statute its normal interpretation.

Subject to the foregoing comments I join in Judge Greene's opinion.

APPENDIX

JA 179

April 15, 1974

The Mercury Code of Ethics below concerns all employees, who are all newspaper people

By this posting as of this date the Code of Ethics becomes a part of the posted office rules for all employees who shall adhere to them under penalty of discipline

## CODE OF ETHICS

Employees of this newspaper are carriers of public discussion and information, acting on their Constitutional mandate and freedom to learn and report the facts. Public enlightenment is the forerunner of justice, and our Constitutional role is to seek the truth as part of the public's right to know the truth. Those responsibilities carry obligations that require newspaper people to perform with intelligence, objectivity, accuracy, and fairness. To these ends, we declare acceptance of the standards of practice here set forth to be the rule:

RESPONSIBILITY: The public's right to know of events of public importance and interest is the overriding mission of this newspaper. The purpose of distributing news and enlightened opinion is to serve the general welfare. Newspaper people who use their professional status as representatives of the public for selfish or other unworthy motives violate a high trust.

FREEDOM OF THE PRESS: Freedom of the press is to be guarded as an inalienable right of people in a free society. It carries with it the freedom and responsibility to discuss, question, and challenge actions and utterances of our government and of our public and private institutions. Newspaper people uphold the right to speak unpopular opinions and the privilege to agree with the majority.

ETHICS: Newspaper people must be free of obligation to any interest other than the public's right to know the truth.

1. Gifts, favors, free travel, special treatment or privileges can compromise the integrity of newspaper people and their employers. Nothing of value should be accepted.

2. Secondary employment, political involvement, holding public office, and service in community organizations should be avoided if it compromises the integrity of newspaper people and their employers. Newspaper people and their employers should conduct their personal lives in a manner which protects them from conflict of interest, real or apparent. Their responsibilities to the public are paramount. That is the nature of their profession.

3. So-called news communications from private sources should not be published or broadcast without substantiation of their claims to news value.

4. Newspaper people will seek news that serves the public interest, despite the obstacles. They will make constant efforts to assure that the public's business is conducted in public and that public records are open to public inspection.

5. Newspaper people acknowledge the newsman's ethic of protecting confidential sources of information.

ACCURACY AND OBJECTIVITY: Good faith with the public and among themselves is the foundation of all worthy newspaper people.

1. Truth in all things is our ultimate goal.

2. Objectivity in reporting the news is another goal, which serves as the mark of an experienced professional. It is a standard of performance toward which we strive. Those who achieve it are to be honored.

3. There is no excuse for inaccuracies or lack of thoroughness.

4. Newspaper headlines should be fully warranted by the contents of the articles they accompany. Photographs and telecasts should give an accurate picture of an event and not highlight a minor incident out of context.

5. Sound practice makes clear distinction between news reports and expressions of opinion. News reports should be free of opinion or bias and represent all sides of an issue.

6. Partisanship in editorial comment which knowingly departs from the truth violates the spirit of American journalism.

7. Newspaper people recognize their responsibility for offering informed analysis, comment, and editorial opinion on public events and issues. They accept the obligation to present such material by individuals whose competence, experience, and judgment qualify them for it.

8. Special articles or presentations devoted to advocacy or the writer's own conclusions and interpretations should be labeled as such.

FAIR PLAY: Newspaper people at all times will show respect for the dignity, privacy, rights, and well–being of people encountered in the course of gathering and presenting the news.

1. The news media should not communicate unofficial charges affecting reputation or moral character without giving the accused a chance to reply.

2. The news media must guard against invading a person's right to privacy.

3. The media should not pander to morbid curiosity about details of vice and crime.

4. It is the duty of news media to make prompt and complete correction of their errors.

5. Newspaper people should be accountable to the public for their reports and the public should be encouraged to voice its grievances against the media. Open dialogue with our readers should be fostered.

PLEDGE: Newspaper people should actively censure and try to prevent violations of these standards, and they should encourage their observance by all their fellow workers. Adherence to this code of ethics is intended to preserve the bond of mutual trust and respect between newspaper people and the public.

Any Mercury employee who does not wholly and fully subscribe to these tenets should make himself known now and state his reasons.

JA 180

May 10, 1972

GENERAL OFFICE RULES

For all Employees of the Pottstown Mercury

These rules include, but are not limited, to all of the office rules for your department. Your department head may add to these rules more specific rules which apply to your department. Violation of office rules may be deemed cause for discharge except in the case of those rules where discharge is automatic:

1. Before starting employment each employee must file with the business office his name, address and telephone number; and thereafter must report promptly to the business office in writing any change in his address or telephone number.

2. W4 forms and any and all employment forms are to be correctly completed in the presence of the Business Manager or the Publisher. They will be initialled, processed and turned over to the payroll department, otherwise, no hire exists.

3. Employees must comply with any procedure set forth by the office for timekeeping or other purposes, including that procedure established for completion and submission of weekly time cards.

4. False or misleading employment record information furnished by an employee is reason for discharge.

5. Intoxication or drinking on company property, or bringing liquor into the building (except liquor purchased and unopened to be taken home) or keeping liquor in lockers, is prohibited. Appearing in or about the Com-

pany premises in an intoxicated condition is absolutely prohibited. Violations of this rule shall subject the offender to immediate discharge. The above applies to drugs in any form.

6. While in or about Company premises, all employees are expected to conform with any and all State laws governing gambling.

7. Employees should handle their affairs in such a manner that creditors will not make complaints to the business office. Employees are expected to pay their legitimate bills, and repeated complaints to the business office will not be tolerated.

8. The office is not responsible for the disposition of personal mail sent to The Mercury. Personal mail should be sent to another address.

9. Loitering on Company premises, stalling, gossiping, or engaging in any unnecessary conversations; visiting between employees or with visitors; uttering profane, loud, abusive or indecent language, whistling or making other unnecessary distracting noise; and quarrelling or engaging in physical violence, disorderly or disturbing conduct of any nature, is prohibited.

10. There shall be no attempt to limit or no limitation on the output of any employee; anyone who, directly or indirectly, encourages, advises, or suggests such limitation, will be promptly dismissed. Engaging in individual or group slow–downs or work stoppages on Company property during working hours will subject the employee involved to immediate dismissal. Carelessness or neglect of duty in carrying out assignments or instructions from those in authority, or insubordination of any kind will be considered an aggravated violation of these rules. All employees shall perform work as directed and at the place or places assigned by the department head.

11. All copy and proof, both news and advertising matter, must be treated as confidential. No information obtained by any employee by reason of his employment shall be made use of for himself or given out, or in any way made known prior to publication. Employees must not deface property of the Company by posting circulars anywhere except on the bulletin board provided for that purpose. Employees are prohibited from writing upon, cutting, scratching or otherwise damaging buildings, walls, floors, furniture, machinery or other equipment or defacing an office sign, or notice, or changing the wording in any way. Wanton destruction of property material or finished work is forbidden. Employees must so conduct themselves outside of office hours as not to reflect adversely on the newspaper or cause loss of business or patronage. Prompt and satisfactory cooperation with fellow workers and other members of this organization is required.

12. Producing matter on machines or by hand for personal use of anyone is strictly forbidden unless requested for the office by the department head or unless permission is first obtained from the department head. The foregoing also applies to all other transactions or work for any person or organization other than the Company while on Company time and premises.

13. Injuries or accidents of any nature must be reported to the department head as soon as possible.

13A. Complete compliance with all Federal, State, or local regulations is required at all times. Any violation is cause for instant dismissal.

14. Employees will not be called to the telephone during working hours except in case of emergency, sickness, etc. Employees should so instruct their families and friends. Outgoing calls will not be permitted, except in

case of emergency, sickness, etc., and with the permission of the department head. When the Company's PBX operator is on duty, the number must be given to her to dial any outgoing calls, and when the PBX operator is not on duty, a record of the call shall be made by employees and such record shall be left with the department head who shall promptly deliver the same to the PBX operator. The employee shall, on request of the office, promptly reimburse the office for all toll calls which he has placed.

15. Turn off motors and lights when not needed. Employees must not waste supplies, water, light or power.

16. Hygienic use of waste receptacles, lavatories and toilets is required. Soap is not to be left in sinks to melt away or clog drains. Oily rags or any material of a combustible nature must be placed in covered metal containers before going off duty. All employees must cooperate to keep machines, materials and the floor clean. Do not throw paper scraps, etc., on the floor. In short, each employee should do his share to keep the building clean and orderly.

17. Employees must immediately report breakage or failure of machinery, furniture, or fixtures to the department head.

JA 181

18. Privately owned goods, material or equipment should not be on the premises without permission and an appraisal release form.

19. Radios and tv should not be used except for news business.

20. Payroll records are confidential and figures will not be provided to anyone other than the department head and the employee concerned.

21. Business matters to be discussed with another department should only be discussed, explained, or otherwise conveyed to the head of the department or the person in charge.

22. The management will not permit the attachment or execution of salaries or assignment of wages. All employees who have their salaries attached or garnished will be subject to dismissal. No advances on salaries will be made before the regularly constituted pay day. Checks will be obtained from the cashier at the business office on that day.

23. In order to receive sick benefits, all employees must have a doctor's certificate stating the nature of the illness, and attesting to the fact that the employee is unable to work on the day specified. The doctor's certificate must be signed only by the doctor on a regular doctor's certificate. The company reserves the right to waive the above rule.

24. No solicitations of funds are permitted on company premises.

25. Persons other than employees are not allowed beyond the lobby except by permission of a department head.