Commonwealth of Pennsylvania, Petitioner *v.* Commonwealth of Pennsylvania, Pennsylvania Labor Relations Board, Respondent. Council 13, American Federation of State, County and Municipal Employees, Intervenor.

Argued June 5, 1981, before Judges ROGERS, WILLIAMS, JR. and PALLADINO, sitting as a panel of three. Reargued December 14, 1982, before President Judge CRUMLISH, JR. and Judges ROGERS, BLATT, WILLIAMS, JR., CRAIG, MACPHAIL and DOYLE.

*Robert F. Beck*, Assistant Attorney General, with him, *John D. Raup*, Chief Counsel, for petitioner.

*Frayda Kamber*, with her, *James L. Crawford, Cheryl G. Young and Anthony C. Busillo, II*, for respondent.

*Richard Kirschner*, with him, *Alaine S. Williams, Kirschner, Walters & Willig*, for intervenor.

OPINION BY JUDGE ROGERS, April 28, 1983:

The Commonwealth of Pennsylvania, as the employer of unionized workers of the Venango County Board of Assistance, here seeks review of an order of the Pennsylvania Labor Relations Board (PLRB) requiring it to cease certain activities which the PLRB has determined constitute unfair labor practices within the meaning of Section 1201 of the Public Employee Relations Act (PERA), 43 P.S. §1101.1201. Specifically, on December 5, 1977, during the term of a collective bargaining agreement effective from July, 1976 until the end of June, 1978, the Executive Director of the Board of Assistance imposed a ban on tobacco smoking by employees at their work stations thereby unilaterally discontinuing a more permissive practice previously applicable. It is not disputed that this ban was imposed and that no attempt was made by the Director prior to its imposition to initiate negotiations on the matter with the exclusive bargaining representative of the employees—intervenor AFSCME District Council 13. The PLRB concluded that this unilateral change in working conditions by the employer during the effective term of a collective bargaining agreement constitutes a "[r]efus[al] to bargain collectively in good faith" prohibited by PERA Section 1201(a)(5), 43 P.S. §1101.1201(a)(5).

The Commonwealth makes three arguments challenging the legal correctness of the Board's order. First, the Commonwealth asserts that the matter of whether to permit employee smoking at their work stations is one of "inherent managerial policy" expressly removed from the scope of mandatory bargaining by PERA Section 702, 43 P.S. §1101.702. Second, the Commonwealth contends that the availability

4

to the union of the alternative remedy of grievance arbitration ousts the PLRB of jurisdiction of this dispute. Finally, it is agued that a provision of the parties' collective agreement has the effect of empowering the employer to make unilateral changes in working conditions like that here involved. We will consider these arguments seriatim.

Before commencing our inquiry we note that it is clearly established that the employer's unilateral accomplishment of a change in working conditions made by statute the subject of mandatory bargaining is an unfair labor practice irrespective of whether the employer's unilateral action takes place during the term of a collective agreement or following the expiration of such an agreement or during the course of negotiations intended to culminate in an agreement. *First National Maintenance Corp. v. National Labor Relations Board*, 452 U.S. 666 (1981); *Ford Motor Company v. National Labor Relations Board*, 441 U.S. 488 (1979); *Fibreboard Corp. v. National Labor Relations Board*, 379 U.S. 203 (1964); *National Labor Relations Board v. Katz*, 369 U.S. 736 (1962). *See Pennsylvania Labor Relations Board v. Williamsport Area School District*, 486 Pa. 375, 406 A.2d 329 (1979) (employer's unilateral change in working conditions following the expiration of a collective agreement is an unfair labor practice); *Appeal of Cumberland Valley School District*, 483 Pa. 134, 394 A.2d 946 (1978) (employer's unilateral change during collective negotiations is an unfair labor practice); *Pennsylvania Labor Relations Board v. Mars Area School District*, 480 Pa. 295, 389 A.2d 1073 (1978) (employer's unilateral change during the term of a collective agreement is an unfair labor practice).

Nevertheless, as we have indicated, the Commonwealth here interposes three defenses to the unfair labor practice charge. The Commonwealth first relies

on PERA Section 702, 43 P.S. §1101.702 which provides:

Matters not subject to bargaining

Public employers shall not be required to bargain over matters of inherent managerial policy, which shall include but shall not be limited to such areas of discretion or policy as the functions and programs of the public employer, standards of service, its overall budget, utilization of technology, the organizational structure and selection and direction of personnel. Public employers, however, shall be required to meet and discuss on policy matters affecting wages, hours and terms and conditions of employment as well as the impact thereon upon request by public employe representatives.

The proper interpretation of this provision as well as of PERA Section 701, 43 P.S. §1101.701 which specifies the matters required to be submitted to bargaining as "wages, hours and other terms and conditions of employment," was set forth in *Pennsylvania Labor Relations Board v. State College Area School District*, 461 Pa. 494, 507, 337 A.2d 262, 266 (1975):

Thus we hold that where an item of dispute is a matter of fundamental concern to the employes' interest in wages, hours and other terms and conditions of employment, it is not removed as a matter subject to good faith bargaining under section 701 simply because it may touch upon basic policy. It is the duty of the Board in the first instance and the courts thereafter to determine whether the impact of the issue on the interest of the employe in wages, hours and terms and conditions of employment outweighs its probable effect on the basic policy of the system as a whole. If it is determined that the matter is one of inherent managerial

policy but does affect wages, hours and terms and conditions of employment, the public employer shall be required to meet and discuss such subjects upon request by the public employe's representative pursuant to section 702.

The problem, then, in every case presenting the issue of the proper scope of collective bargaining is to weigh the employees' interest in the terms and conditions of their employment against the employer's legitimate interest in directing the overall scope and direction of the enterprise. In *First National Maintenance Corp. v. National Labor Relations Board*, 452 U.S. at 675-676, the Court described the relevant inquiry under the federal equivalent to PERA Section 701—Section 8(d) of the NLRA, 29 USC §158(d):

> Although parties are free to bargain about any legal subject, Congress has limited the mandate or duty to bargain to matters of "wages, hours, and other terms and conditions of employment." A unilateral change as to a subject within this category violates the statutory duty to bargain and is subject to the [NLRB's] remedial order. . . .
>
> Nonetheless, in establishing what issues must be submitted to the process of bargaining, Congress had no expectation that the elected union representative would become an equal partner in the running of the business enterprise in which the union's members are employed.
>
> . . . .
>
> Some management decisions, such as choice of advertising and promotion, product type and design, and financing arrangements, have only an indirect and attenuated impact on the employment relationship. (Footnotes omitted.)

The pertinent and often repeated description by Mr. Justice STEWART of the line of demarcation contained in his concurring opinion in *Fibreboard Corp. v. National Labor Relations Board,* 379 U.S. at 222-225, holding that the employer's decision to subcontract its maintenance work and the attendant decision to terminate a unit of unionized employees, ought first to have been submitted to bargaining; is as follows:

> In common parlance, the conditions of a person's employment are most obviously the various physical dimensions of his working environment. What one's hours are to be, what amount of work is expected during those hours, what periods of relief are available, what safety practices are observed, would all seem conditions of one's employment.
>
> . . . .
>
> This kind of subcontracting falls short of such larger entrepreneurial questions as what shall be produced, how capital shall be invested in fixed assets, or what the basic scope of the enterprise shall be.

Employing these formulations, the National Labor Relations Board and the United States appellate courts have repeatedly held that matters pertaining to an employee's break time and the use thereof must be submitted to bargaining. *See Ford Motor Co. v. National Labor Relations Board, supra* (in plant food services and vending machine prices); *American Oil Co. v. National Labor Relations Board,* 602 F.2d 184 (8th Cir. 1979) (revision of work schedule); *International Woodworkers of America, AFL-CIO v. National Labor Relations Board,* 127 U.S. App. D.C. 81, 380 F.2d 628 (1967) (work-week changes); *Larsen Supply Co., Inc.,* 251 NLRB No. 175, 105 LRRM 1177 (1980) (lunch hour changes); *Appalachian Power Co.,* 250 NLRB No. 38, 104 LRRM 1366 (1980) (discon-

tinuance of washup period); *J. P. Steven's Co., Inc.,*
239 NLRB No. 95, 100 LRRM 1052 (1978) (reduction
in break time given to consecutive shift workers);
*Anchor Tank,* 239 NLRB No. 52, 99 LRRM 1622
(1978) (change in lunch break punch-out policy);
*Chateau de Ville, Inc.,* 233 NLRB No. 161, 97 LRRM
1051 (1977) (revocation of permission to drink coffee
previously extended to on-break waitress employees.)
Indeed, the NLRB has held that the subject of a smok-
ing ban must be submitted by the employer to bargain-
ing. *Chemtronics, Inc.,* 236 NLRB No. 21, 98 LRRM
1559 (1978). *See also Albert's Inc.,* 213 NLRB No.
686, 87 LRRM 1682 (1974) (unilateral area restric-
tions on smoking).

The subject of whether employees may smoke at
their workplaces appears to us to be at the center of
those subjects properly described as "conditions of em-
ployment" and to be entirely unrelated to those entre-
preneurial or managerial judgments fundamental to
the basic direction of the enterprise and removed
from the scope of mandatory bargaining by PERA
Section 702, 43 P.S. §1101.702.[1]

The Commonwealth next argues that the avail-
ability to the union of a contractual grievance arbitra-
tion mechanism assertedly broad enough to encompass
the instant dispute ousts the PLRB of its subject mat-

---

[1] We recently held in *Chambersburg Area School District v.
Pennsylvania Labor Relations Board,* 60 Pa. Commonwealth Ct. 29,
430 A.2d 740 (1981), *allocator granted,* September 23, 1981, *appeal
denied,* June 27, 1982, that the peculiar characteristics of public ed-
ucation as an enterprise including the necessity that teaching em-
ployees serve as role models to the students, rendered private sector
authorities concerning employee smoking bans unserviceable in the
context of charges filed against a public school district employer
who sought to impose such a ban. The Commonwealth does not rely
on the *Chambersburg Area School District* case and we do not believe
that its authority, so expressly grounded in the characteristics of
the enterprise of public education, is applicable to this employer.

ter jurisdiction under PERA Section 1301, 43 P.S. 1101.1301

> to prevent any person from engaging in any unfair practice listed in Article XII of this act. This power shall be exclusive and shall not be affected by any other means of adjustment or prevention that have been or may be established by agreement, law, or otherwise.

The construction pressed by the Commonwealth flies in the face of the final sentence of Section 1301. Moreover, Judge (later Justice) WILKINSON, could not have more clearly decided this point when he wrote for the Court in *Pennsylvania Labor Relations Board v. General Braddock Area School District,* 33 Pa. Commonwealth Ct. 55, 63, 380 A.2d 946, 950 (1977)

> We cannot, therefore, conclude that the PLRB is powerless to investigate charges of unfair labor practices merely because a collective bargaining agreement exists under which grievance arbitration is available for the determination of issues similar to those upon which the charges are based.

*Accord York County Hospital & Home v. AFSCME Local 1485,* 57 Pa. Commonwealth Ct. 336, 426 A.2d 1224 (1981). The Commonwealth does not expressly ask us to overrule these cases and we decline to do so as they appear to be required by the clear mandate of the statute and to be consistent with such other authorities as our research has disclosed which bear on the subject.[2]

---

[2] The NLRB has announced and has more or less consistently followed a practice of deferral to "fair and regular" arbitration proceedings previously conducted, *Speilberg Mfg. Co.,* 112 NLRB No. 139, 36 LRRM 1152 (1955), and has refused to process an unfair labor practice charge if the underlying dispute could be taken to arbitration, *Collyer Insulated Wire,* 192 NLRB No. 150, 77 LRRM 1931 (1971). However, on review of the occasional NLRB decision

Finally, the Commonwealth argues that the PLRB misconstrued a provision of the parties' collective bargaining agreement which provision, in the Commonwealth's view, excuses it from the necessity of bargaining with the union during the contract's term and permits the employer's unilateral action concerning issues which are not expressly included in the contract. The provision, which we are told is commonly incorporated in collective agreements and is denominated as a "waiver" or "zipper" clause, is in its entirety as follows:

> The Commonwealth and the Union acknowledge that this Agreement represents the results of collective negotiations between said parties conducled (sic) under and in accordance with the provisions of the Public Employe Relations Act and constitutes the entire agreement between the parties for the duration of the life of said Agreement; each party waiving the right to bargain collectively with each other with reference to any other subject, matter, issue or thing whether specifically covered herein or wholly omitted herefrom and irrespective of whether said subject was mentioned or dis-

---

not to defer to arbitration it has repeatedly been held that the availability of an arbitral dispute resolution mechanism does not oust the agency's unfair labor practice jurisdiction. *Caterpillar Tractor Co. v. National Labor Relations Board*, 658 F.2d 1242 (7th Cir. 1981) ; *National Labor Relations Board v. General Warehouse Corp.*, 643 F.2d 965 (3d Cir. 1981) ; *Newspaper Guild of Greater Philadelphia, Local 10 v. National Labor Relations Board*, 204 U.S. App. D.C. 278, 636 F.2d 550 (1980).

One commentator has examined these practices and policies of the NLRB in great detail and has concluded that differences in the applicable statutory mandate require the PLRB to disclaim any general deferral policy. Cowden, "Deferral to Arbitration by the Pennsylvania Labor Relations Board," 80 Dickinson Law Review 666 (1977).

cussed during the negotiations preceding the execution of this Agreement.

The matter of the proper interpretation and application of this provision was the primary subject of the PLRB's opinion accompanying its Order here subject to review. In its opinion, the PLRB discusses in detail previous decisions of that body which have ascribed to provisions like that set forth above an effect of rendering lawful unilateral changes in working conditions made by an employer with respect to matters excluded from the collective agreement executed by the parties. The PLRB then asserts that its interpretation is contrary to the present weight of authority both in the private sector and in the public sector collective bargaining of our sister jurisdictions. By these authorities, a union waiver of the right to bargain on mandatory subjects during the term of an agreement will not be found in a boiler plate waiver clause alone. Instead, the prevailing view, in the PLRB's analysis, is that such clauses may only be employed as a shield by either party to prevent incessant demands during the contract term made by the other party seeking to alter the status quo. Use of the clause as a sword by one seeking to impose unilateral changes without first bargaining is not favored. The PLRB concludes with its determination to now embrace the majority view and to decide the instant case accordingly.

We have examined the authorities relied on by the PLRB[3] and are convinced that it has accurately characterized the conflicting positions and their relative

---

[3] *See e.g. Pepsi-Cola Distributing Co.*, 241 NLRB No. 136, 100 LRRM 1626 (1979) ; *Unit Drop Forge Division*, 171 NLRB No. 73, 68 LRRM 1129 (1968) ; *Goodyear Aerospace Corp.*, 204 NLRB No. 119, 83 LRRM 1461 (1973) ; *North Sacramento School District*, 3 PERC 10079 (N.Y. 1978) ; *Monterey Peninsula Unified School District*, 3 PERC 10147 (Cal. 1978).

acceptance among the judicial and regulatory bodies that have addressed the debate. Moreover, from our examination of the precise language employed by the parties to express their intention in this regard, we believe it is entirely reasonable for the PLRB to determine that the parties never intended by this provision to permit unilateral mid-term alterations in working conditions.[4] The PLRB has been charged with primary jurisdiction over, and it is possessed with great expertise in, the resolution of competing concerns and interests among public employees and their employers. We defer to that expertise.

ORDER

AND Now, this 28th day of April, 1983, the order of the Pennsylvania Labor Relations Board in the above-captioned matter is hereby affirmed.

---

[4] We note that the parties also included the following "past practices" provision in their agreement.

Employe benefits and working conditions now existing and not in conflict with the Agreement shall remain in effect subject, however, to the right of the Employer to change these benefits or working conditions in the exercise of its management rights reserved to it under Article II of this Agreement.

If the employer's interpretation of the "zipper clause" were accepted, the purpose and effect of this provision would be problematic in the extreme.

---

DISSENTING OPINION BY JUDGE MACPHAIL, April 28, 1983:

I respectfully dissent.

While the invocation of the employers' restrictive smoking regulation was unilateral in the sense that management made by the change without specific bargaining, the regulation was promulgated by the Commonwealth in response to complaints from employees that smoking at the work-place interfered with the per-

formance of their duties. It must be observed also, that under the regulation smoking was permitted in specific designated areas apart from the work-place.

As the majority points out, the crux of this case depends upon a balancing of the employees' interests in the terms and conditions of their employment against the employer's legitimate interest in directing the overall scope and direction of the enterprise. Unlike the majority, however, I would conclude that a ban on smoking at the work-place, when such smoking affects the work quality or productivity of employees, is a matter of inherent managerial policy affecting the scope and direction of the employers' enterprise. In view of the "zipper" clause, *see* slip op. at 8 and the "past practices" clause, *see* slip op. at 11, n.4, included in the bargaining agreement, I would hold that the implementation of the Commonwealth's smoking regulation did not constitute an unfair labor practice and I would, accordingly, reverse the PLRB.

President Judge CRUMLISH, JR. joins in this dissent.

DISSENTING OPINION BY JUDGE DOYLE:

I join in the dissent and would also point out that, in considering the weight to be given on the scale balancing employee conditions of employment on the one hand and matters of inherent managerial policy on the other, the rights of non-smoking employees, and the corresponding obligations of employers, must be considered. *See Smith v. Western Electric Company,* 643 S.W. 2d 10 (Mo. Ct. of Appeals, 1983), where the Missouri Court of Appeals recently held that an employee may enjoin his employer from permitting him to be exposed to tobacco smoke in the employee's workplace because of his medical reaction to the smoke. The Court found that the employer had a common-law duty to provide the employee with a safe place to work.