634 A.2d 808

**PERRY COUNTY, Petitioner,**

v.

**PENNSYLVANIA LABOR RELATIONS BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 11, 1993.

Decided Dec. 1, 1993.

288

Charles J. Hartwell, for petitioner.

Timothy Tietze, for respondent.

Before COLINS and McGINLEY, JJ., and SILVESTRI, Senior Judge.

McGINLEY, Judge.

Perry County (County) petitions for review of an order of the Pennsylvania Labor Relations Board (PLRB) which found that the County failed to demonstrate by a preponderance of the evidence that Sergeant John A. Seiders (Seiders), a correctional officer at the County's prison, would have been dismissed in the absence of his participation in any protected activity. We affirm.

Seiders was hired by the County in 1989 as a correctional officer and was subsequently promoted to sergeant in October of 1990. In April of 1991 the Teamsters Local 776 (Union) started an organizing campaign at the prison. That month Seiders, along with ten of approximately twenty eligible employees, attended a Union organizing meeting and signed a Union authorization card. Seiders was vocally pro-Union and expressed a number of concerns regarding the operation of the prison. Seiders also distributed an additional four or five Union cards to employees who were not at the meeting. Seiders had previously informed Robert Shull (Shull), the warden, that he would be attending the Union meeting.

On September 23, 1991, the Union filed a petition for representation with the PLRB. On October 11, 1991, just eighteen days later, Shull called a mandatory staff meeting and informed all correctional officers that the Prison Board was unhappy with the operation of the prison and that each individual employee would be reevaluated. Shull further stated that there would be changes made, including promotions and demotions, and that some people would be terminated.

One week later, on October 17, 1991, Seiders was in charge of the 4 p.m. to midnight shift. His responsibility was to staff the central control room. At approximately 8 p.m., while

Seiders and a visiting constable, Lieutenant Donald Reisinger (Reisinger) were in the central control room, a prisoner began a disturbance in the hallway leading to cell block A. Seiders, after checking that the other inmates were in their cells, left the control room and returned the inmate to his cell in cell block E. As a result, the central control room was abandoned for approximately twenty seconds.

Upon returning to the control room, Seiders realized that he erred when he left the room and that his conduct was contrary to standard operating procedures. He telephoned the warden who ordered him to write up a misconduct report. Seiders complied. By letter dated October 21, 1991, he was informed by Deputy Warden Leslie B. Noss (Noss) that the Prison Board's Disciplinary Committee consisting of Shull, Noss and Reisinger charged him with three conduct violations: abandoning his post, conduct unbecoming an officer and breach of security resulting from the incident. Seiders was further informed that a hearing would be held on these charges.

On October 24, 1991, after a hearing the Disciplinary Committee concluded that Seiders committed all three violations. Each member recommended dismissal. Seiders was immediately suspended without pay pending dismissal. On October 29, 1991, Seiders appealed to the full Prison Board seeking a hearing. By letter dated November 21, 1991, the Prison Board notified Seiders that it concurred without conducting its own hearing with the committee's findings and that he was discharged from County employment effective October 25, 1991.[1] Approximately one to two weeks after the October 24, 1991, Disciplinary Committee hearing Shull, during a private conversation with a correctional officer at the prison, remarked that if Seiders had not gone to the Union, he would not have treated him as harshly as he did.

On January 27, 1992, the Union filed a charge of unfair labor practices against the County, alleging violations of Section 1201(a)(1) and (3) of the Public Employee Relations Act

1. In the interim, on November 12, 1991, the PLRB issued an order directing a union election by secret ballot at the prison.

(PERA).[2]  On February 3, 1992, the Secretary of the PLRB issued a complaint and notice of a hearing set for March 19, 1992.

After efforts at conciliation failed, a hearing was held and both parties presented testimony and introduced documentary evidence.  On July 2, 1992, the hearing examiner issued a proposed decision finding that the County committed unfair labor practices as defined by Sections 1201(a)(1) and (3) of PERA and ordering that Seiders be reinstated.  The County filed exceptions.  On September 29, 1992, the PLRB dismissed the exceptions and directed that the proposed decision be made absolute and final.  The County appeals.[3]

█  The County presents two issues for our review.  The County contends (1) that the PLRB's conclusion that Seiders' discharge was a result of anti-union animus is unsupported by substantial evidence and (2) that the PLRB erred because Seiders would have been discharged even in the absence of any union activity.  Our scope of review of a PLRB order is limited to determining whether there has been a constitutional violation or an error of law and whether the necessary findings are supported by substantial evidence.  *City of Reading v. Pennsylvania Labor Relations Board,* 130 Pa.Commonwealth Ct. 397, 403, 568 A.2d 715, 718 (1989).  "As long as the Board's findings are supported by substantial evidence, they are conclusive on appeal.  It is the PLRB's function to appraise the conflicting evidence, determine credibility matters,

2.  Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. §§ 1101.1201(a)(1) and (3).  Section 1201 provides in pertinent part:

(a) Public employers, their agents or representatives are prohibited from:

(1) Interfering, restraining or coercing employes in the exercise of the rights guaranteed in Article IV of this Act [right to form, join or assist in employe organizations].

. . . .

(3) Discriminating in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any employe organization.

3.  On October 20, 1992, the PLRB denied the County's application for supersedeas.  On November 30, 1992, this Court also denied a application for supersedeas on behalf of the County.

resolve factual questions and draw inferences from the facts and circumstances." *Id.*

In *Harbaugh v. Pennsylvania Labor Relations Board,* 107 Pa.Commonwealth Ct. 406, 528 A.2d 1024 (1987), we noted that a party asserting that an unfair labor practice has been committed has the burden of establishing that charge. *Id.* at 411, 528 A.2d at 1027. In *Harbaugh* we further noted that an unfair labor practice charge under 43 P.S. § 1101.1201(a)(3) of discrimination based on union activity requires proof that the employer was motivated by an unlawful motive or displayed anti-union animus. The PLRB is permitted to draw inferences of unlawful motive from the facts. *City of Reading,* 130 Pa.Commonwealth Ct. at 404, 568 A.2d at 719.

In the present case our examination of the record reveals substantial evidence from which it can reasonably be inferred that the County engaged in discriminatory conduct in the events surrounding Seiders' discharge. It is undisputed that Seiders and the other correctional officers were engaged in union organizing activities and that the County knew of this activity. Reproduced Record (R.R.) at 285–87. The PLRB inferred unlawful motive based on the content and timing of Shull's October 11, 1991, meeting, coming just eighteen days after the Union filed a representation petition. As the PLRB noted, Shull made it clear at the meeting that he spoke at the *Prison Board's* direction, that the *Prison Board* would make "changes" based on "how the *Prison Board* interpreted some of their concerns" and that the union was a concern of the *Prison Board.* R.R. at 287a (emphasis added). Shull also informed all correctional officers that over the upcoming two weeks to a month each individual would be reevaluated, and he warned that there would be drastic changes including promotions and dismissals. R.R. at 230–31. As the PLRB noted, both the timing and content of this meeting, being held during an organizational campaign, support an inference of anti-union animus. Further evidence of the County's discriminatory and retaliatory conduct is found in the testimony of Correctional Officer Robert Kauffman, who related the previously men-

tioned private conversation with Shull approximately one to two weeks after Seiders' discharge.

The County also argues that even if Shull was motivated by anti-union animus the Prison Board's review of the facts removes any taint. The County's position is untenable. An employer is responsible for the acts of its supervisor when he commits an unfair labor practice during the course of his employment. *Allegheny Pepsi–Cola Bottling Company v. National Labor Relations Board,* 312 F.2d 529 (3d Cir.1962). In *Allegheny Pepsi* the Third Circuit Court of Appeals noted:

> The Board adopted the findings of the trial examiner that Sears [employee's supervisor] was discriminatorily motivated in making his report and that because of this the Board concluded that Lapidus [company president] himself was not so motivated in ordering the discharge and because Sears' bias was not attributable to the company president, the § 8(a)(3) charge should have been dismissed. This argument does not withstand analysis. Petitioner concedes that Sears is a supervisor within the meaning of the [National Labor Relations] Act. As such, the report he made to Lapidus was obviously within the scope of his employment. There is no question but that it was the cause of Dommel's [employee] discharge. That being so, the only question was whether Sears was discriminatorily motivated in making the report.... To rule otherwise would provide a simple means for evading the Act by a division of corporate personnel functions.

312 F.2d at 531.

We find the rationale in *Allegheny Pepsi* to be persuasive in the present case. Shull, as Seiders' supervisor and a member of the Disciplinary Committee, was acting in the course of his employment when he suspended Seiders and recommended his discharge. Also, in *City of Reading,* we noted that "anti-union statements made to Union members by individuals who are ultimately responsible for terminating an employee or recommending termination of that employee can

demonstrate unlawful motive." 130 Pa.Commonwealth Ct. at 404–05, 568 A.2d at 719.

■ Nevertheless, the County contends that Seiders would have been discharged regardless of his union activities because he seriously breached prison security at the time of the incident. The County argues that it is critical to the legitimate security concerns of its citizens that it deal most harshly with officers who allow breaches of security to occur. Thus, the County asserts that Seiders' discharge is an appropriate remedy under its standard operating procedures.

The PLRB was not convinced that Seiders' breach of security was the actual cause of his discharge. Rather, as already noted, the PLRB concluded that Seiders' discharge was motivated by anti-union animus as clearly indicated by Shull's remark to Kauffman that but for Seiders' union activities he would not have taken the action he did. The County's argument also ignores Shull's admission that he was delivering the Prison Board's "message" regarding possible dismissals during the October 11, 1991, meeting. Consequently, the PLRB's findings that Shull's actions were motivated by anti-union animus are supported by substantial evidence.

■ As further noted by the PLRB, once Seiders established a prima facie case of anti-union animus, the burden then shifted to the County to establish by a preponderance of the evidence that Seiders would have been discharged even in the absence of his union activity. We hold that the PLRB did not err in concluding that the County failed to meet this burden. Although there is conflicting testimony of record, questions of credibility and the weight to be given conflicting evidence are for the PLRB to determine. *City of Reading.*

We affirm the order of the PLRB.

## ORDER

AND NOW, this 1st day of December, 1993, the order of the Pennsylvania Labor Relations Board in the above-captioned matter is affirmed.

SILVESTRI, Senior Judge, dissenting.

Perry County is a seventh class county [1] and as such, pursuant to Section 408 of the Second Class County Prison Board Act,[2] created a county prison board composed of the president judge of the court of common pleas, the district attorney, the sheriff, the controller, and the commissioners of the county.

John A. Seiders (Seiders) was a correctional officer employed by Perry County in the County Prison. On October 17, 1991, Seiders committed a breach of security while on duty at the prison. Immediately following the incident, Seiders telephoned the prison's warden, Robert Shull (Shull) to inform him of the incident. Shull told Seiders to file a written report on the incident. Seiders did so.

Upon Seiders filing of a written incident report, Deputy Warden Noss (Noss) conducted an investigation. He then formulated charges against Seiders. (R.R. 111a). The charges included: abandoning his post, conduct unbecoming an officer and breach of security. Noss notified Seiders of the charges by letter dated October 21, 1991.

On October 24, 1991, a hearing was held on the matter by the prison Disciplinary Committee. The Committee consisted of Shull, Noss, and Lieutenant Donald Reisinger. Following the hearing, all three members of the Disciplinary Committee drafted separate decisions. All three found Seiders guilty of the charges against him and all three recommended an indefinite suspension. On October 29, 1991, Seiders appealed the Disciplinary Committee's decision to the County Prison Board. A *de novo* hearing was held before the Prison Board.[3] As to the facts of Seiders' breach of security there was no substantial dispute. The Prison Board made a finding that Seiders committed a violation and by letter dated November 21, 1991,

1. Department of General Services, The Pennsylvania Manual, 558 (Kathleen DiFlaviana ed. 1991).

2. Act of January 25, 1966, P.L. (1965) 1577, *as amended,* 61 P.S. § 408.

3. The proceedings before the Prison Board are not included in the record.

advised him that as of October 25, 1991, he was discharged. (R.R. 299a). Seiders did not appeal from the Prison Board's decision.

Thereafter, on January 27, 1992, Teamsters Local 776 initiated the present action by filing a charge of unfair labor practices against the County, alleging violations of Section 1201(a)(1) and (3) of the Public Employee Relations Act.[4]

On September 29, 1992, the PLRB entered its final order finding that the County did commit an unfair labor practice based upon anti-union animus. The majority sustains this decision. My review of the record, which follows, is persuasive that there is no substantial evidence to support the PLRB's finding of an unfair labor practice.[5] Accordingly, I dissent.

Here, the PLRB, in determining that Seiders' discharge was motivated by anti-union animus, stated the following in its final order:

What is supported by the record ... is that Seiders participated in protected activity; that the County was aware of that protected activity; and that the County was motivated by anti-union animus in taking the adverse action against this employe. *The revealing admission made by Warden Shull provides direct evidence as to the motivation of the discharging supervisor.*

4. Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. §§ 1101.1201(a)(1) and (3). Section 1201 provides in pertinent part:
(a) Public employers, their agents or representatives are prohibited from:
(1) Interfering, restraining or coercing employes in the exercise of the rights guaranteed in Article IV of this Act [right to form, join or assist in employe organizations].
....
(3) Discriminating in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any employe organization.

5. Our scope of review of a PLRB order is limited to determining whether there has been a constitutional violation or an error of law and whether the necessary findings are supported by substantial evidence. *City of Reading v. Pennsylvania Labor Relations Board,* 130 Pa.Commonwealth Ct. 397, 568 A.2d 715 (1989).

(PLRB's Final Order, p. 1). (Emphasis ours). (Citations omitted).

The PLRB's reference to "the revealing admission made by Warden Shull" refers to testimony, elicited at the hearing, of a Robert Kaufmann. Kaufmann testified as follows:

Q. Now, did you ever have a discussion with Warden Shull about the discharge of Sergeant Seiders?

A. Yes, we did.

Q. Approximately how much time had elapsed from the time of his suspension until your conversation?

A. Between one and two weeks.

Q. And where did the conversation take place? Who else was there, if anybody?

A. *Just the warden and myself.*

Q. Can you tell us what was said?

A. Well, we were talking about vehicles and so forth; I use to work for his father, and just kind of general, and we got to talking about John's release and so forth.

And I told him, I said: in my opinion, I said, I think you let the best sergeant go that you had here other than Sergeant David Wilt.

Well, he said: I have reservations about it too, he said, if he wouldn't have gone to the union and so forth, and the papers, I don't think I would have treated him as harshly as I did.

Q. Was that the end of your conversation

A. Yes, sir.

.       .       .       .       .

Q. To your knowledge, did you ever have any other conversation with the warden about the union?

A. No.

(R.R. 260a–262a).

From this testimony, the PLRB determined that Shull was Seiders' "discharging supervisor" and as such was motivated by anti-union animus as evidenced by his "revealing admis-

sion." Both these conclusions, however, are unsupported by the record. First, the record clearly demonstrates that Shull was not a member of the Prison Board and that it was the Prison Board, not Shull, that discharged Seiders. Additionally and significantly, the PLRB's reliance on Kaufmann's testimony as to Shull's "revealing admission" as Seiders' "discharging supervisor" is unsupported by the evidence. Kaufmann testified that he had the conversation with Shull, as set forth hereinabove, "between one and two weeks" from the time of Seiders' suspension by the Disciplinary Committee. However, one or two weeks after Seiders' suspension would have been, approximately, November 1, 1991 or November 8, 1991. At the time of the alleged conversation, Seiders was suspended, not discharged, and Seiders had already filed an appeal, on October 29, 1991, to the Prison Board regarding the Disciplinary Committee's suspension. Seiders' hearing before the Prison Board was held on November 21, 1991, and by letter of the same date, the *Prison Board* informed him that he was discharged. Thus, there is no evidence to support the PLRB's determination that Shull discharged Seiders or that Shull was his "discharging supervisor."

The PLRB's reliance upon Shull's animus as a basis for concluding that the County committed an unfair labor practice has no basis in the record. There is nothing in the testimony indicating that Shull ever reacted to Seiders' union activity. Seiders testified in this regard as follows:

Q. Were you involved in any activity with Teamsters Local 776 in 1991?

A. I was involved to the extent that I had signed cards and supported their coming in to the Perry County Prison to represent us.

Q. Did you sign a card at the Newport Hotel in April 1991?

A. Yes, I did.

Q. And at that meeting, Mr. Shughart, was he in charge?

A. Yes, he was.

Q. And at that meeting, did you speak up at all?

A. Yes.

Q. Were you the most outspoken person at the meeting?

A. I don't believe I was the most outspoken, but I was certainly vocal.

Q. And approximately how many people attended this meeting in April of 1991 at the Newport Hotel?

A. Ten.

Q. And you signed a card then; did you also sign a membership card in September of 1991?

A. Yes, I did.

Q. Do you recall why you signed another one in September of 1991?

A. Between April and September, there was a lapse with absolutely no activity taking place regarding the union, and I had been away for several weeks, and when I came back, talk of the union had started up again, and they said they wanted some reinforcements, so when offered the card, I signed one.

Q. Did you take any additional cards from Mr. Shughart in September of 1991 to have other employees sign?

A. Not in September; I took some in April.

Q. Okay, in April 1991 you took additional cards from Mr. Shughart?

A. Yes.

Q. Did you (sic) employees sign it?

A. Yes, I distributed them to the employees.

Q. Approximately how many did you give out?

A. Four or five.

Q. And that's in April of 1991?

A. Yes.

Q. And was the warden aware of the union meeting?

A. He was aware of the first union meeting in April because I told him.

Q. Okay, tell us what you said and what he said.

· · · · ·

A. When I was invited to the union meeting, I went into the warden's office and I told him—and I cannot give you an exact quote—but words to the effect that: I am sure you are aware that there is union talk going on; there is a meeting, it was either tonight or the next night, but I don't recall exactly that.

But I wanted you to know that I was going to be attending that union meeting, and I will be going down.

The warden told me yes, he knew that there was a union meeting going on, that he had a connection somewhere with someone who was affiliated in some way with the union.

Q. And after you had a conversation with the warden, did you go to the meeting?

A. Yes, I did.

· · · · ·

Q. After the meeting took place, were there any additional conversations with the warden that you recall?

· · · · ·

A. Not that I recall.

(R.R. 212a–216a).

Seiders further testified:

Q. At the prison, when you were handing out the organization cards, at that time—you said it was in April—approximately how many officers were at the prison that would be covered by a bargaining unit; I'm talking about the sergeants and the COs [correctional officers].

A. At that point, I believe there was 20.

Q. And of the 20 people it involved besides yourself, how many other cards did you pass out for people to sign?

A. I passed out four or five.

Q. And you signed your own card, also?

A. I signed my own.

Q. So you were responsible for five or six people?

A.   Yes.

(R.R. 235a).

Seiders further testified regarding his conversation with Shull:

Q.   Sergeant, why would you want to go in six months, or five months, after you are promoted and tell the warden that you are going to a union meeting?

Is that the type of relationship you had with the warden; you could go walk in and tell him all these little details?

A.   I felt that—I went through a union election and stuff once before when I was in broadcasting—and I found that the simplest thing for myself and everybody that was involved was to be very up front and straight and direct with the general manager of the station, instead of running around and sneaking and trying to slip down to a union meeting, and worry about whether somebody was going to—

In fact, when we were at the meeting—and I don't know if you remember or not, Chuck—that Officer John Briner was very concerned about whether there were spies out here to see who was attending the meeting or not.

And I said: I'm not worried about it, folks; I went in and told the warden I was going to be here.

Q.   So that was the reason that you went in and told him?

A.   Absolutely; I did not want to have the warden feel that I was running behind his back, trying (sic) pull anything, and do this and do that.   I went straight, direct to him.

Q.   Now, from April to October, this incident date, did you have any problems with the warden?

A.   What do you mean by problems?

Q.   Well, were you treated unfairly in any way that you thought the warden was picking on you?

A.   I could say yes, but I will answer no.   There was a situation involving some remarks and perhaps insinuations that I had received from the warden that was more along the lines of my National Guard membership.

Q.   It had nothing to do with your union affiliation?

A. I don't know.

(R.R. 256a–257a).

. . . . .

Q. Before the union activity of yours of April 1991, did the warden ever say anything unpleasant about your National Guard service?

A. He never said anything directly about it.

(R.R. 258a).

Q. Going back to the night in April when you had this meeting at Newport, you said there were approximately ten of your corrections officers there and probably Chuck or somebody else; was there anybody there from management?

A. No.

Q. But you told the warden and the warden acknowledged that there was going to be a meeting there?

A. I did

Q. Did he know who was there?

A. I have no idea.

Q. I mean, you didn't tell him who was there?

A. No, I hadn't been to the meeting yet.

Q. But he said he knew of the meeting?

A. Yes.

Q. Were there any other cards being passed out by anybody else but you?

A. Oh, yes.

Q. Other correctional officers?

A. Yes.

(R.R. 241a–242a).

There is nothing in Seiders above quoted testimony that would demonstrate or even imply that Shull reacted in a hostile manner to Seiders', or any other prison employees', union involvement.

As further support for its conclusion that Shull reacted to the union with animus, the PLRB relied upon the fact that

Shull held a meeting with some of the prison employee's on October 11, 1991, shortly after the union filed for representation on September 23, 1991. The PLRB stated:

[A]t that meeting ... the warden warned of upcoming drastic changes including demotions and dismissals ... the warden, by his own admission, was speaking at the prison board's direction. And at that meeting the warden made it perfectly clear to correctional officers, by his own admission, that the prison board would make "changes" based on "how the prison board interpreted some of their concerns...."
... *Correspondingly, the warden made it imminently (sic) clear to the correctional officers at the October 11 meeting that the union election was also a concern of the prison board.*

(PLRB's Final Order, p. 2). (Emphasis ours).

There is nothing in the record supporting the PLRB's statement that "the warden made it imminently clear to the correctional officers at the October 11 meeting that the union election was also a concern of the prison board." The PLRB makes no reference to the record for support of this conclusion for the simple reason that there is none. The only testimony as to what transpired at that meeting was that of Seiders and Shull. Seiders' testimony is as follows:

Q. And we have agreed that the petition of the Teamsters was filed on September 23, 1991, is the date. Then you testified there was a mandatory meeting held by the warden before your discharge. Correct?

A. That's correct.

Q. And did he express displeasure at that meeting about certain things?

A. A lot of times the reference he was using was "they", which I took to mean "they", the Prison Board.

For example, some of the cost that was involved in the operation of the prison down there; we had two water jugs, one in each control room, for the officers. And they were going to take those from us.

There were complaints, our complaints about the food; they were going to stop feeding us on the 4:00 to 12:00 shift our food, our chow in there, which is no big deal. You know, they can do that; we can bring our lunch.

(R.R. 258a).

Shull's testimony about the meeting was:

Q. And you did have a meeting of all the employees about a week before his discharge, did you not?

A. Yes, I did.

Q. And you told them there could possibly be some changes made?

A. I told them there could possibly be some changes made as to whether and how the prison board interpreted some of their concerns, but how—

.      .      .      .      .

A. The references to "they" were continually made, and that was, the reference was, the prison board.

Q. Did you tell them there would be some people demoted?

A. Yes, I did. I said there could possibly be as a result of inquiries by the board.

Q. Did you tell them some people may be gone?

A. As a result of—yes.

Q. And at that time, early October, whenever this meeting was held, the petition with the Teamsters had already been filed?

A. I had no knowledge of what point we were with all this.

(R.R. 286–287a).

Based upon the forgoing testimony concerning the meeting held by Shull, it is clear that there is nothing to indicate that the meeting was somehow related to the union's activity or that the Prison Board was concerned with the union's activity.

Although our courts have not defined the term "anti-union animus," the PLRB has stated those factors it considers in determining whether an employee's discharge was motivated in response to union activity. These factors, as stated by the PLRB, include:

The entire background of the case, including any anti-union activities by the employer; statements by the discharging supervisor tending to show the supervisor's state of mind; the failure of the employer to adequately explain the discharge, or layoff, of the adversely affected employe, the effect of the discharge on unionization activities—for example, whether leading organizers have been eliminated; the extent to which the discharge or laid-off employe engaged in union activities; and whether the action complained of was "inherently destructive" of important employe rights.

*Child Development Council of Centre County,* 9 Pa.Pub. Employee R. ¶ 9188 (1978).

Additionally, Black's Law Dictionary 87 (6th ed. 1990) defines "animus" as an "intention" or "design." Webster's Third New International Dictionary 89 (1966) defines "animus" as "ill will, antagonism or hostility usually controlled but deep-seated and sometimes violent."

Using the PLRB's standard for what factors should be used when determining if anti-union animus was a motivation for an employer's action, and based upon the definitions of animus set forth hereinabove, it is clear from the record that there was no evidence of an intention or design, ill will, antagonism or hostility on the part of Shull or the County towards Seiders; nor is there any evidence to support the criteria delineated by the PLRB in *Child Development* of "anti-union activities by the employer" (County was employer); "statements by the discharging supervisor tending to show the supervisor's state of mind" (Shull was not the discharging supervisor); "failure of the employer to adequately explain the discharge" (Seiders was discharged by the Prison Board for an admitted breach of security, a dischargeable offense, from which he took no appeal); "the effect of the discharge on unionization activities" (there is no evidence the Seiders' discharge by the Prison Board in any way affected unionization activities); "whether leading organizers have been eliminated" (there is no evidence that Seiders was a leading organizer of the unionization of the prison employees); "the extent to which the discharge or laid-off employe engaged in union

activities" (Seiders' testimony is he attended one union meeting in April; nothing happened until September when he passed out 4 or 5 cards soliciting other prison employees); "whether the action complained of was inherently destructive of important employe rights" (there is no evidence that the discharge of Seiders by the Prison Board on November 21, 1991 in any manner affected the organizing activities of the union or the certification of the union).

Here, it is clear that Seiders committed a breach of prison security, the breach was a dischargeable offense, he was afforded due process, he was discharged by the Prison Board, and he never appealed his discharge. The evidence in this case demonstrates beyond peradventure that the PLRB, in its zealousness, not only ignored the law as to substantial competent evidence, as well as its own requisite factors for determining anti-union animus, but instead misconstrued, misstated and twisted evidence to arrive at the erroneous conclusion that Seiders was discharged by Shull, not the Prison Board, because of his participation in union activity.

Based upon the foregoing, I would reverse the PLRB's order.