INDIANA BOROUGH, Petitioner,

v.

PENNSYLVANIA LABOR RELATIONS BOARD, Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Dec. 13, 1996.

Decided June 4, 1997.

Wayne A. Kablack and Thomas Rivosecchi, Indiana, for petitioner.

James L. Crawford and Elizabeth Kelly, Harrisburg, for respondent.

David M. Green, Harrisburg, for intervenor, Indiana Borough Police Benevolent Assoc.

Before SMITH and FLAHERTY, JJ., and RODGERS, Senior Judge.

FLAHERTY, Judge.

Indiana Borough (Borough) petitions for review of a final order of the Pennsylvania Labor Relations Board (PLRB or Board) finding that the Borough committed unfair labor practices (ULP) under Section 6(1)(a) and (e) of the Pennsylvania Labor Relations Act[1] (PLRA) by unilaterally changing the work schedule of its police officers, who are represented for collective bargaining purposes by the Indiana Borough Police Benevolent Association (Association), from a steady shift system to a rotating shift system without first fulfilling its bargaining obligations under Act 111.[2] We affirm.

The facts, as found by the Board, are essentially as follows. On July 16, 1992, the Borough and the Association entered into a collective bargaining agreement (CBA) effective from January 1, 1992 through December 31, 1993. In June, 1993, negotiations for a successor CBA were entered into culminating in another CBA effective January 1, 1994 through December 31, 1997. In February 1991, the Borough's mayor unilaterally implemented a steady shift schedule system in response to the requests of numerous police officers. At this time, the Borough assigned individual shifts based on both employee seniority and preference and reserved the right to alter the shift assignments based upon need. In September 1991, the Borough implemented the steady shift system permanently. Thereafter, to afford officers an opportunity to make a change in their shift assignment, the Borough posted sign-up sheets periodically but informed the officers that assignments would be made on the basis of seniority and could be altered by the Borough based on need. Officers were informed that the sign-up sheets did not guarantee any officer's shift preference all or most of the time. The Borough continued to use steady shifts until 1995.

During the negotiations on the CBA between the parties in 1992 and 1993, the Borough never requested that the officers' schedules be changed from a steady shift to a

---

1. Act of June 1, 1937, P.L. 1168, *as amended,* 43 P.S. § 211.6(1)(a), (e).

2. Act of June 24, 1968, P.L. 237, 43 P.S. §§ 217.1—217.10. This piece of legislation is popularly referred to as "Act 111."

rotating shift, and at no time did the Association ever agree to the change.

On January 2, 1995, the Borough changed one day of the officers' weekly work schedule so that the officers would appear in court while on duty. In response to this change, the Association filed the first charge of ULP with the PLRB, which is currently pending and is otherwise unrelated hereto except that following April 19, 1995, the parties engaged in negotiations concerning the ULP charges over the "court day" scheduling, at which time the possibility of eliminating the steady shift system was also discussed by the Association. (R.R. at 39a, 40a.)

On May 18, 1995, the Borough unilaterally eliminated the steady shifts by posting a schedule implementing a rotating shift system as of June 19, 1995. On June 29, 1995, the Association filed the instant second ULP charges, alleging that the Borough was obligated to negotiate with and obtain agreement from the Association on the change in scheduling systems as a mandatory subject of bargaining under Act 111.

From the year 1992 to the present, the Borough and the Association were parties to two CBAs, the material provisions of which are the same for purposes of the matter currently in dispute. Article II of each CBA contained a "management rights" clause stating, in relevant part, as follows:

> The collective bargaining unit agrees that except for limitations of other provisions of this agreement, express or implied, there are functions, powers, responsibilities and authorities belonging solely to the Borough, prominent among which, but by no means wholly inclusive, are; ... *the determination of work to be performed; the determination of operation schedules; the determination of the number of shifts to be worked ....*

(R.R. at 312a, 327a.)(emphasis added). In addition, each CBA contained a clause stating as follows:

> In the administration of all matters covered by this agreement, officials and employees are governed by the provisions of any existing and future laws or regulations including the provisions of the Borough Code and Code of Ordinances of the Bor-

ough of Indiana and the policies set forth specifically in the personnel compensation plan and the personnel rules and regulations; said Borough Code, Ordinances and manuals being incorporated herein by reference to the same extent and in the same manner as if said Borough Code, Ordinances and manuals were set forth herein in detail. This agreement is at all times to be applied subject to such laws, regulations and policies and the provisions of said manuals as the same now exist or as amended during the term hereof.

(R.R. at 313a, 328a.) Each CBA contained an additional clause entitled "PAST PRACTICES," which stated that "[a]ll existing benefits not modified by this Award shall remain as is." (R.R. at 325a, 341a.) Finally, each CBA contained a "zipper" clause stating as follows:

> The parties acknowledge that during the negotiations which resulted in this agreement each had the unlimited right and opportunity to make demands with respect to any subject or matter not removed by law from the area of collective bargaining, and that the understanding and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this agreement. Therefore, the Borough and the Policemen, for the life of this agreement, each voluntarily and unqualifiedly waive the right, and each agrees that the other shall not be obliged to bargain collectively with respect to any subject or matter referred to, or covered by this agreement or with respect to any subject matter not specifically referred to or covered in this agreement even though such subjects or matters may not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this agreement.

(R.R. at 322a–23a, 338a.)

█ In a proposed decision and order issued February 21, 1996, the hearing examiner concluded that the change in shift systems was, indeed, a mandatory subject of bargaining and that the Association had not waived the right to bargain on this issue in the CBA;

as such, he concluded that the Borough committed ULP in violation of Sections 6(1)(a) and (e) of the PLRA[3] and Act 111.[4] The PLRB subsequently dismissed the Borough's exceptions to the proposed order, making it final. The Borough then filed a petition for review with this court.[5]

The Borough presents four issues for our consideration: (1) whether the PLRB's finding that the Borough had a steady shift system in effect prior to the change is supported by substantial evidence; (2) whether the issue of altering the officers' work schedules to a rotating shift was a mandatory subject of collective bargaining under Act 111; (3) whether the Association waived its right to collectively bargain over the issue of rotating shifts by the terms of the CBA and the circumstances surrounding its formation; and (4) whether the Borough can be found guilty of ULP for scheduling rotating shifts when it acted under the reasonable belief that it had the right and power to do so under the CBA.

■ With respect to the Borough's first allegation of error, we note that factual findings of the PLRB are conclusive on appeal as long as they are supported by substantial evidence. *Perry County v. Pennsylvania Labor Relations Board*, 160 Pa.Cmwlth. 287, 634 A.2d 808, 810 (1993). For purposes of appellate review over an agency's factual determinations under 2 Pa.C.S. § 704, substantial evidence has been defined as "such evidence which a reasonable mind might accept as adequate to support a finding." *York Terrace/Beverly Enterprises v. Workmen's Compensation Appeal Board (Lucas)*, 140 Pa.Cmwlth. 75, 591 A.2d 762, 764 n.4 (1991).

■ On the issue of the type of scheduling system in effect before the Borough instituted the rotating shift system, three sign-up sheets and various time sheets were introduced into evidence by which the Borough, at various times prior to the change, solicited the personal shift preferences of the individual officers. In addition, numerous time sheets were introduced at the hearing showing the weekly hours worked by each officer for the years 1993 through 1995. These time sheets demonstrate that the officers worked substantially the same shifts each week during the time periods in question, although their days off varied from week to week. Finally, Corporal Frank A. Kovalcik of the Borough's police department testified repeatedly at the hearing that the Borough had a steady shift system in effect prior to the change in 1995. The foregoing evidence offered at the hearing provides substantial evidence to support the PLRB's finding that the Borough had a steady shift system in effect during the years in question; as such, this finding is conclusive on appeal. *Perry County*.

■ Next, the Borough argues that the PLRB erred in concluding that the issue of changing from a steady shift to a rotating shift was a mandatory subject for collective bargaining under Act 111. The Borough asserts that changing the shift systems was a managerial prerogative because its policy objectives in implementing the change substantially outweigh the impact of the change on its employees and because the change involved the management of the municipality's fiscal affairs.

■ In *Township of Upper Saucon*, this court upheld identical ULP charges against a township for unilaterally altering the work schedules of its police officers from a rotating

---

**3.** Act 111 is to be read *in pari materia* with the PLRA, Sections 6(1)(a) and (e) of which make it an unfair labor practice for a public employer "[t]o interfere with, restrain or coerce employes in the exercise" of their collective bargaining rights or "[t]o refuse to bargain collectively with the representatives of his employes." *Philadelphia Fire Officers Ass'n v. Pennsylvania Labor Relations Board*, 470 Pa. 550, 369 A.2d 259 (1977).

**4.** Act 111 gives police and firemen "the right to bargain collectively with their public employers

concerning the terms and conditions of their employment, including compensation, hours, working conditions, retirement, pensions and other benefits." 43 P.S. § 217.1.

**5.** Appellate review over decisions of the PLRB is limited to determining whether constitutional rights were violated, errors of law committed or whether findings of fact are not supported by substantial evidence. 2 Pa.C.S. § 704; *Township of Upper Saucon v. Pennsylvania Labor Relations Board*, 152 Pa.Cmwlth. 530, 620 A.2d 71, 73 n. 3 (1993).

shift to a steady shift system. In so ruling, we concluded that the change from rotating to steady shifts was a mandatory subject of bargaining under Act 111 and that the right to bargain over the issue had not been waived by the officers' collective bargaining unit. As we stated in *Upper Saucon*, "an issue is deemed bargainable [under Act 111] if it bears a rational relationship to employees' duties." 620 A.2d at 73; *see* Section 1 of Act 111, 43 P.S. § 217.1. We noted, however, that a public employer's management objectives are also to be considered. Nonetheless, for an issue to be deemed a managerial prerogative and thus not a mandatory subject of bargaining, "a managerial policy concern must *substantially outweigh* any impact an issue will have on the employes." 620 A.2d at 74.

In *Upper Saucon*, we upheld the Board's determination that officers' shift schedules are rationally related to their duties. *Id.* Here, the correctness of such a conclusion is equally apparent. *Upper Saucon*, however, involved a scenario which is converse to the one at issue (i.e. a change from rotating to steady shifts, rather than vice versa); therefore, the policies which the public employer sought to advance in that case are not identical to those which the Borough argues in this case.

Here, the Borough asserts that by changing to a rotating shift, it sought to remedy the following problems: poor morale, the inability to train and expose new officers to all aspects of the job, the polarization and isolation of officers from the police department and the community, and the general failure to provide for the overall experience of police work. (hearing examiner's Op. at 5.) Admittedly, however, the change was primar-

ily designed to save the Borough money by reducing the amount of overtime compensation that had to be paid to late shift officers for the days which they are required to spend in court.[6]

The hearing examiner found that the change from steady to rotating shifts resulted in the loss of shift differential pay for some officers as well as the loss of overtime pay.[7] (Finding of Fact No. 22) In addition, the hearing examiner recognized that the officers had other interests effected by the shift change, including a substantial change in lifestyle due to the schedule change and the potential loss of outside employment (due to the lack of fixed schedules). (Hearing Examiner's Op. at 6.) Finally, the officers alleged that the shift change also had negative physiological and emotional effects on them due to the disruption of sleep patterns, which is said to result each time an officer must habituate to a change in shifts, and that it may impair the officers' ability to effectively work as a team due to personnel changes.[8] (R.R. at 45a–47a.)

While the policy concerns which the Borough sought to address are legitimate, there are substantial facts of record to support the Board's conclusion that these managerial policy concerns do not substantially outweigh the impact which the change in shift systems had on the officers in question. As such, the Board did not err in concluding that changing shift systems was not a managerial prerogative under the reasoning in *Upper Saucon*.

█ The Borough additionally argues that changing shift systems was a managerial prerogative because it was motivated by fiscal concerns and involved the municipal budget,

---

6. Late shift officers are required to spend more time in court due to the fact that they make more arrests. Because such officers must appear in court during their off-duty hours, the Borough is required to pay them a minimum of four hours of "straight-time" pay for each such appearance under the terms of the CBA. The Borough is required to pay the officers "time and one half" their straight rate of pay for any time spent in excess of four hours. (R.R. at 314a, 329a.)

7. Officers who work between 6:00 PM and 6:00 AM are paid an extra $ .50 per hour in shift differential pay. Those officers who lost over-

time were primarily night shift officers who had off-duty court dates prior to the schedule change.

8. One officer testified that some of the midnight shift officers were concerned that other·officers who get assigned to the midnight shift against their wishes may not be as receptive to the added stress and dangers associated with this shift. As such, they may hesitate in providing the back up needed to deal with the many fights encountered in the bars and fraternities of Indiana Borough, which is a college town. (R.R. at 66a–67a.)

citing *International Association of Fire Fighters, Local 669 v. City of Scranton,* 59 Pa.Cmwlth. 235, 429 A.2d 779 (1981). In *City of Scranton,* we concluded that the determination of the total number of fire fighters which a municipality will employ was a matter of managerial discretion and not a mandatory subject of bargaining under Act 111. To hold otherwise, we stated, would be to "give the public employees' union the right to have a major decision-making impact on governmental spending, budgeting, the level of police and fire protection that the municipality must provide, and even taxation, because salaries for the additional employees must come from public funds." *Id.* 429 A.2d at 781. We did not, however, state that issues otherwise bargainable under Act 111 become matters of managerial prerogative simply because they are motivated by fiscal concerns. Here, the mere fact that the shift change was implemented by the Borough in an effort to save money on overtime compensation for its officers does not make the issue "a major policy-making question" such as the determination of the total force strength necessary for fire and police protection. *Id.* As such, our reasoning in *City of Scranton* does not alter our conclusion in the instant case that the shift system change was not a matter of managerial prerogative.

▮ The Borough further argues that it was not required to bargain over the changing of shift systems because the Association waived its right to bargain on the issue under the terms of the parties' CBA, thus giving the Borough the right to unilaterally implement such a change. As evidence of this waiver, the Borough points to the following: (1) language in the "managerial rights" clause of the CBA reserving to the Borough power over "the determination of operation schedules" and "the determination of the number of shifts to be worked"; and (2) provisions in The Borough Code,[9] which states that "[t]he mayor ... shall direct the time during which ... the chief of police and police force shall perform their duties," 53 P.S. § 46121, and in the police department

rule manual, which states that "[o]fficers and employees shall work such days and hours as prescribed by the Chief of Police."[10] (R.R. at 385a.)

▮ As we stated in *Upper Saucon,* however, "waiver of the right to bargain may only be found when the words show a clear and unmistakable waiver." 620 A.2d at 76. Moreover, in concluding that the union had not waived the right to bargain over the changing of shift systems in that case, we explicitly held that "broad language in a management rights clause will not support a waiver." *Id.* at 75–76. In *Upper Saucon,* the management rights clause reserved to management "the right to schedule hours." *Id.* at 75. We do not believe that the language of the management rights clause in the instant case, reserving power over "the determination of operations schedules," materially differs to a degree that would warrant a departure from our holding in *Upper Saucon.* Nor do the broad statements in The Borough Code and the police manual regarding the general powers of the mayor and chief of police alter our conclusion. As such, the Board did not err in concluding that the broadly worded language referenced by the Borough falls short of showing a "clear and unmistakable waiver" by the Association of the right to bargain over a fundamental change in the shift system under which officers are scheduled. *Id.*

▮ The Borough additionally points to the presence of a "zipper" or "waiver" clause in the parties' CBA. The presence of this standard clause, however, does not alter our conclusion. On numerous occasions, we have voiced our approval of the principle, first espoused by the Board, that such clauses are generally to be used as a shield "to prevent incessant demands during the contract term made by the other party seeking to alter the status quo." *Commonwealth v. Pennsylvania Labor Relations Board,* 74 Pa.Cmwlth. 1, 459 A.2d 452, 453 (1983). However, the "[u]se of the clause as a sword by one seeking to impose unilateral changes without first

9. Act of February 1, 1966, P.L. (1965) 1656, *as amended,* 53 P.S. §§ 45101–48501.

10. Both The Borough Code and the police department rule manual are incorporated into the parties' CBA by Article IIIB thereof.

bargaining is not favored." *Id.*. Here, there is no evidence of the specific intent of the parties in adopting the waiver clause.[11] As such, the inclusion of such a standard clause in the parties' CBA is insufficient to show a waiver of the right to bargain. *PLRB*, 474 A.2d at 1215.

■ Finally, the Borough asserts that it cannot be found guilty of ULP because it was acting under the reasonable belief that it had the right to unilaterally change the shift scheduling system under the terms of the CBA, citing our decision in *Upper Saucon.* While the public employer in *Upper Saucon* raised a similar defense, we declined to address it because by not raising it as an exception to the hearing examiner's order, the employer waived it. In addressing the waiver issue, although we stated that "[c]ontractual privilege is a separate affirmative defense," we did not in any way explain the mechanics for determining the validity of such a defense nor did we cite any authority therefor. 620 A.2d at 73. Here, the Borough cites no other authority from this or any other court of the Commonwealth that explains or validates the "contractual privilege" defense and we have been unable to locate any after our own independent research; as such, the Borough's argument must fail.

Having determined that the Board committed no error in its decision, the Board's final order is hereby affirmed.

### ORDER

AND NOW, June 4, 1997, the order of the Pennsylvania Labor Relations Board, dated June 11, 1996, at Case No. PF–C–95–151–W, is hereby affirmed.

11. While the Borough asserts that "the subject of scheduling was discussed by the parties during [the 1993 CBA] negotiations and specifically addressed in the agreement," the only testimony offered at the hearing on this issue was that during negotiations by the parties, apparently on the 1992 agreement, the Association informed the Borough that it "wanted the benefit of having steady shifts in writing," but the Borough refused to do so. (R.R. at 54a.) The subject of changing the system of shift scheduling, however, was never discussed, and the hearing examiner specifically found that "during the negotiations for both collective bargaining agreements the Borough never requested that the scheduling system be changed from a steady system to a rotating system." (R.R. at 405a.) While the Association, by agreeing to the "zipper clause," may have waived the ability to seek to have the Borough's then-existing system of steady shifts formalized in writing during the term of the parties' CBA, there is no evidence that it intended to waive its statutory right to bargain over a fundamental change in the system of shift scheduling, which was in effect in the current agreement as well as the previous agreement and which we have determined is a mandatory subject for collective bargaining under Act 111.